S. J. Campbell and Ileen B. Campbell v. Commissioner.
Campbell v. Commissioner
Docket No. 56121.
United States Tax Court
T.C. Memo 1961-166; 1961 Tax Ct. Memo LEXIS 183; 20 T.C.M. (CCH) 825; T.C.M. (RIA) 61166; June 8, 1961
*183 1. Petitioner and his wife are the controlling shareholders of a closely held corporation having 2 offices in Illinois and 1 in New York. Petitioner is the president, and was in charge of the Chicago office. In taxable years 1949 and 1950 petitioner and his wife occupied an apartment in Chicago, as their home was located outside of the city. The corporation paid the rent and other apartment expenses in the 2 years totaling $9,887.14. It also paid $8,291 for a European trip of petitioner and his wife. The petitioner withdrew $5,539.53 in cash as expense allowances in the 2 years. The corporation paid for store, hotel, and club charges, entertainment, and box seats to livestock and horse shows totaling $3,240.63 in 2 years; it paid for petitioner's wife's travel and Ritz Carlton Hotel expenses when she went with him to New York; and it paid hotel and entertainment expenses incurred by petitioner during the National Horse Show. The disputed expenses of the petitioner and cash paid by the corporation totaled over $12,400 in 1949 and over $15,900 in 1950. The corporation deducted these amounts in its returns. The corporation did not require any accounting by petitioner for cash received *184 and expenses incurred; petitioner did not keep any records of them. The Commissioner determined that the corporation had assumed and paid certain personal expenses of the petitioner and denied the corporation deductions for them. Under the Cohan rule, he approximated the amounts of certain business expenses and allowed the corporation deductions for them, only. The corporation did not contest the determinations. The respondent included about $7,965 for 1949 and about $12,755 for 1950 in petitioner's income for personal expenses paid by the corporation. Held: (1) Under section 22(a), 1939 Code, the petitioner should have included in gross income in his income tax returns all amounts received for expenses of traveling, lodging, and meals during business trips, and all reimbursed expenses in connection with his employment; and then availed himself of the provisions of sections 22(n) and 23(a)(1)(A) for taking allowable deductions in computing his adjusted gross income. Respondent's inclusions in petitioner's gross income of cash and reimbursements received in connection with his employment sustained. (2) The petitioner realized income from the corporation's payments of his personal expenses *185 for rent, utilities, decorating, and purchases. (3) Amounts expended in order that a wife may accompany a taxpayer on his business trips are personal expenses unless there is proof that the wife's presence served a bona fide business purpose directly related to the conduct of the business of the taxpayer or his employer. Petitioner failed to prove that his wife's presence on trips in the United States and abroad was for a bona fide business purpose related to his employer's business; therefore, the costs of her trips were personal expenses and petitioner realized income from the corporation's payments of her travel, hotel, and other expenses. The respondent's determinations of the amounts of income realized from such payments for the wife's trips to New York are sustained; the amount of income realized from the corporation's payment of the expenses of the wife's trip to Europe is approximated. (4) Petitioner's European trip during 2 months was in part a business trip and in part for his personal enjoyment; he realized income through the corporation's payments for the personal portion of the trip. Since he failed to prove the allocable cost of the business portion of the trip, an approximation *186 is made of such cost; the amount of income realized from the corporation's payment of personal expenses is determined. (5) Only entertainment expenses which are directly related to the conduct of a business and are ordinary and necessary are business expenses; to the extent that they are primarily social and personal and not directly related to the operation of a business, they are not business expenses. Absent records and adequate proof, approximations are made of business entertainment expenses; amount of income realized from the corporation's payment of social and personal entertainment expenses is determined. Louis Boehm, 35 B.T.A. 1106; James Schulz, 16 T.C. 401, followed. (6) The petitioner has failed to prove that all of his own hotel and entertainment expenses during the period of the National Horse Show in New York in 1949 were ordinary and necessary expenses directly related to the corporation's business; his wife's presence during this trip to New York with him did not serve any bona fide business purpose related to the corporation's business; and approximation is made of the allocable cost of the business part of petitioner's trip; the amount of income realized from the *187 corporation's payment of personal expenses is determined. (7) Where a corporation pays cash, in the form of expense allowances, to an officer-employee, who is a dominant stockholder, without requiring submission of any accounting by him, and the employee-taxpayer fails to keep records showing the amounts, purposes, and nature of his expenditures thereof; and where the respondent has applied the rule of Cohan v. Commissioner, 39 F. 2d 540, in the absence of such records, so as to allow some amount as ordinary and necessary expenses in the conduct of the employer's business, but has determined, also, that part of the cash was expended by the employee for his personal expenses and has included such amount in the employee's taxable income under sections 22(a) and 115, 1939 Code; and where such employee-taxpayer before this Court gives only general testimony about how the cash allowances were spent, without any specifications, such general testimony is not sufficient to prove that a larger amount than the respondent determined represented ordinary and necessary expenditures directly related to the conduct of the corporation's business, and this Court on the basis of such vague testimony *188 will not make a second application of the Cohan rule to the total sum involved for the taxpayer's benefit. The petitioner's evidence with respect to his use of the corporation's cash allowances to him is insufficient to overcome the presumed correctness of the respondent's determination. (8) An alternative claim for deductions presented for the first time on brief and not claimed in the pleadings is not before the Court and will not be adjudicated. 2. Petitioner held for more than 6 months hackney horses, show horses. They were not used in his farming business but were accounted for in the general farm accounts and were included in the inventory of livestock. He showed the hackneys at horse shows; he received premiums and incurred expenses which exceeded the premiums. He sold hackneys in the taxable years at a profit. Only by selling them could he realize profit. Held: Petitioner held the hackneys primarily for sale to customers in the ordinary course of a business; they were not property used in a business within section 117(j)(1); the gains from sales cannot be considered as gains from the sale of capital assets under section 117(j)(2), and are taxable as ordinary income. 3. Petitioner *189 owned and rented riding horses. He sold several at a loss. They were held for more than 6 months. Held: The riding horses were property used in a business within section 117(j)(1). In determining whether under section 117(j)(2) recognized gains exceed recognized losses, all recognized gains from sales of properties used in the taxpayer's business are to be compared with recognized losses to determine whether gains exceed losses. Since petitioner had recognized gains in excess of the loss from the sales of riding horses, the losses shall be considered as losses from the sale of capital assets under section 117(j)(2). B. W. Flinn, C.P.A., City Hall Bldg., Rockford, Ill., and Karl C. Williams, Esq., for the petitioners. Walter T. Hart, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined income tax deficiencies for 1949 and 1950 in the amounts of $4,588.82 and $9,602.81, respectively. The first question is whether amounts paid by a corporation to cover expenses incurred by one of the petitioners represented income to petitioners rather than ordinary and necessary business expenses of the corporation. The second question is whether gains *190 from sales of horses were capital gains. Finding of Fact The petitioners filed joint returns for the taxable years with the collector of internal revenue for the first district of Illinois. The issues relate to S. J. Campbell. Therefore, he is referred to hereinafter as the petitioner. Issue 1. Campbell was the president, a director, and a stockholder of Kable News Company, an Illinois corporation, in 1949 and 1950 and during the 15 preceding years. Kable News is engaged in the business of buying magazines and periodicals on consignment from publishers and selling them on consignment to wholesalers throughout the United States. The publishers are located in the United States and in Toronto, Canada. The business of Kable News is highly competitive. It competes with about 12 other concerns engaged in the same business. In the taxable years, Kable News dealt with about 30 publishers and 850 wholesale dealers, and it handled over 150 magazines and periodicals, and also, pocketbooks. The wholesalers to whom Kable News sells publications make sales to operators of newsstands located in drugstores, hotel lobbies, on streets, and other places patronized by the general public. Some of the *191 magazines are devoted to special kinds of material such as detective stories, comics, crossword puzzles, popular science subjects, and articles dealing with astrology. Kable News maintains an office in New York City where 50 individuals were employed in 1949 and 1950. It also maintains an office in Chicago where there are 2 employees. It has an office in Mount Morris, Illinois, 120 miles from Chicago, where there are about 75 employees, all of its accounting work is done, all of the magazines and books (printed by others) are received from the publishers, and from which they are reshipped to the customers of Kable News. Kable News also employs salesmen who travel and local representatives. The solicitation and promotion of business, purchases and sales, and general business contacts are handled in the New York and Chicago offices. A large percentage of the corporation's business is taken care of by the New York office. Warren Angel was a director and the manager in charge of the New York office until his death in January 1949. George B. Davis became the manager of the New York office in June 1949. Campbell was in charge of the Chicago office prior to and during the taxable years. The *192 corporation's gross receipts were over $11,835,600 in 1949, and $9,993,271 in 1950. It had a net profit for 1949 of about $50,348, and a loss for 1950 of about $212,000. The corporation paid dividends in the amount of $15,000 in 1949, and $13,600 in 1950. The outstanding stock of Kable News in 1949 and 1950 consisted of 20,000 shares of common stock, of which the Campbells owned 13,600 shares, and Warren Angel and the estate of Angel's deceased wife owned 6,400 shares. Of the stock owned by the Campbells, 10,100 shares were held in their names, jointly, and 3,500 shares were held in the name of Ileen Campbell. The Campbells, owning the majority stock, controlled Kable News. On January 9, 1950, Kable News agreed to purchase the 6,400 shares formerly owned by Angel and his deceased wife's estate, with the intention of holding those shares as treasury stock. Those shares were held in escrow pending the purchase of all of them by Kable News. It acquired those shares by December 15, 1950. Thereafter, there were outstanding only the 13,600 shares owned by the Campbells. The directors of Kable News during 1949 and 1950 were Campbell, his wife, and Charles E. Stuart. Ileen Campbell was neither *193 an officer nor an employee of Kable News. The Campbells maintain their home in Mount Carroll, Illinois, which is 128 miles west of Chicago and 30 miles from Mount Morris. They occupied, however, an apartment in Chicago, leased by Kable News, during a substantial period during 1949 and 1950. They kept personal belongings and clothing in the apartment at all times. The Campbells own and operate farms in Carroll County comprising 2,500 acres. The farms are located near and close to their home in Mount Carroll. At his farms, Campbell kept a few riding horses and hackney horses. He is interested in horses. Campbell's duties during the taxable years as the president and chief executive of Kable News included negotiating and executing contracts for the corporation, holding conferences with the executives and representatives of wholesalers and publishers, promoting the business of the corporation, and attending meetings and conventions of publishers, wholesalers, and distributors. He visited the New York office of Kable News occasionally. During the taxable years, Kable News paid bills and invoices for expenses incurred by or for Campbell. Such charges were billed directly to the corporation. *194 They were for railroad and pullman tickets, hotel bills, the rent of the Chicago apartment and other apartment expenses, purchases of merchandise, restaurant charges, tickets to shows, and an all-expense trip to Europe in 1950 for Campbell and his wife. In addition, the corporation paid Campbell a cash expense allowance. The total amounts disbursed by the corporation for all of such items was $12,436.05 in 1949, and $15,984.67 in 1950, all of which were included in the corporation's deductions in its returns for 1949 and 1950 for traveling, entertainment, and other business expenses. Upon the audit of the income tax returns of Kable News for its fiscal years ending on September 30, 1949 and 1950, the Commissioner determined that of the above amounts, only $4,470.35 was deductible by the corporation for 1949, as business expense, and only $3,229.66 was deductible for 1950; and he disallowed deductions of $7,965.70, for 1949, and $12,755.01, for 1950. The Commissioner included in petitioners' taxable income $7,965.70, for 1949, and $12,755.01 for 1950 on the ground that they had received income from Kable News in cash and through payments for their personal benefit. He gave the following *195 explanation: It is determined that you received from Kable News Company, in the form of cash and payments for your personal benefit, the amount of $7,965.70 during * * * 1949 and the amount of $12,755.01 during * * * 1950, which amounts constitute taxable income to you * * * under sections 22(a) and 115 of the Internal Revenue Code. The total amounts of bills paid by Kable News for expenses of Campbell and the cash received by Campbell from the corporation in 1949 and 1950, the portions of each item for which the corporation was allowed business expense deductions, and the portions which the respondent determined constituted income of Campbell (which are in dispute) are set forth in the following schedule: Deductions
Amounts
Expenses Paid
Allowed
Added to Camp-
Dates
by Kable News Co.
Total Paid
Kable News
bell's Income
1949
1949
Rent Chicago Apt.
$ 4,771.14
$ 2,385.57
$ 2,385.57
1949
Cash to Campbell
3,562.84
1,187.61
2,375.23
1/18
Stop & Shop Store
351.34
0
351.34
1/31
Ritz Carlton, N. Y.
642.84
321.42
321.42
1/31
R.R. Tickets, N. Y.
97.92
0
97.92
4/12
R.R. Tickets, N. Y.
382.95
191.48
191.47
4/12
Ritz Carlton, N. Y.
338.55
169.27
169.28
5/4
Decorating Apt.
430.00
215.00
215.00
10/5
International Livestock Show
270.00
0
270.00
10/10
National Horse Show
378.00
0
378.00
10/28
Royal Winter Horse Show
75.00
0
75.00
11/23
Ritz Carlton, N. Y.
775.65
0
775.64
12/19
Saddle & Sirloin Club
359.83
0
359.83
$12,436.05
$ 4,470.35
$ 7,965.70
1950
1950
Rent Chicago Apt.
$ 4,686.00
$ 2,343.00
$ 2,343.00
1950
Cash to Campbell
1,976.69
658.89
1,317.80
4/14
R.R. Tickets, N. Y.
243.69
121.85
121.84
5/18
R.R. Tickets, N. Y.
211.84
105.92
105.92
8/31
R.R. Tickets, Chicago
142.54
0
142.54
9/27
International Livestock Show
270.00
0
270.00
9/28
Party, Chicago Apt.
162.75
0
162.75
Sub-total
$ 7,693.51
$ 3,229.66
$ 4,463.85
1950
European Trip
8,291.16
0
8,291.16
Total
$15,984.67
$ 3,229.66
$12,755.01
*196 During 1949 and 1950, Campbell received cash from the corporation in the amount of $100 or $250 at a time. His secretary in Chicago, or a secretary in the New York office, wrote checks of the corporation, cashed them, and gave cash to Campbell. The total amounts of such cash withdrawals here in dispute, as shown in the above schedule, were $3,562.84, in 1949, and $1,976.69 in 1950. The schedule below shows the dates of such checks and the amounts received by Campbell at about the same time. 1949
Received by Campbell
1/7
$ 100.00
2/15
112.08
3/10
107.76
3/25
100.00
3/31
101.75
4/20
100.00
4/25
200.00
5/18
100.00
5/25
151.50
6/14 *
591.50
6/28
100.00
7/8
100.00
7/21
100.00
8/5
100.00
8/16
100.00
9/9
100.00
9/28
150.00
10/10
101.15
10/14
101.10
10/20
150.00
10/27
100.00
11/17
200.00
11/23
150.00
11/25
100.00
12/15
100.00
12/28
143.11
12/28
2.89
$3,562.84
1950
1/17
$ 100.00
1/20
100.00
1/26
250.00
2/13
106.50
2/21
109.55
3/3
150.00
3/28
210.64
4/12
100.00
4/26
100.00
5/17
100.00
5/26
100.00
6/8
100.00
6/16
150.00
6/30
100.00
9/8
100.00
9/22
100.00
$1,976.69 All employees of Kable News other than Campbell were required to and did submit written expense accounts in which expenditures were itemized and explained, on the basis *197 of which the corporation made reimbursement for the employee's expenditures, including those for travelling and entertainment expenses. Their expense allowances were limited. Campbell did not keep or submit to the corporation any record of his use of the funds which he received from the corporation or of any of his expenditures charged to and paid by Kable News. Campbell received a cash allowance through corporation checks made payable to a secretary who, in turn, gave cash to him in amounts of from $100 to $250. The corporation's treasurer and comptroller, Robert B. Martin, did not require that Campbell submit any accounts or explanations with respect to his expenditures and the charges incurred by him. Martin, without question, approved and paid all bills for expenses incurred by Campbell and approved the checks for cash withdrawn for Campbell's use. Martin accepted Campbell's or his secretary's general explanation that the bills and the cash expenditures were incurred by Campbell as the chief executive of Kable News. In making his determinations the respondent applied the rule of Cohan v. Commissioner, 39 F. 2d 540, and made an approximation of what portion of each total amount *198 of expense, by items, represented a business expense of the corporation and, therefore, was not income of Campbell. He allowed as the corporation's business expense, one-half of the rent and certain charges of the Chicago apartment, one-half of certain hotel, railroad ticket expenses, and other items, and for lack of any substantiation of the purpose, he disallowed all of other items. Chicago Apartment: The corporation leased the apartment. The rent was $390.50 per month, $4,686 per year. It also paid the gas and electricity charges of $42 and $43.14, respectively, per year in 1949. The total expenses for 1949 was $4,771.14. It did not pay the utilities charges for 1950, but only the rent. The apartment was redecorated at the lessee's expense in 1949 by Canga Brothers for $430, which the corporation paid. Ileen selected colors and made decisions about the work. Campbell and his wife occupied the apartment for about 40 weeks, except weekends and while they were away on trips, during 1949 and 1950. They employed a full-time maid whose wages they paid. They paid the telephone bills and, in 1950, the utilities bills. Campbell was in charge of the Chicago office and did a great deal of *199 his work there. It served his personal convenience to occupy the apartment and saved him personal expenses which otherwise he would have paid. However, the apartment was used by the corporation during the taxable years when other executives of the corporation stayed overnight and wholesale distributors of magazines and others with whom the corporation did business were entertained by executives of the corporation at cocktail parties and dinners. For such uses of the apartment not more than one-half of the rent, the utilities charges, and decorating expense constituted business expenses of the corporation. One-half of the rent and utilities charges for 1949 and one-half of the 1950 rent were Campbell's personal expenses, and through the corporation's payments of them he realized income of $2,385.57 in 1949, and $2,343 in 1950, and income of $215 from its payment of decorating expense. Stop and Shop Store: In 1949 the corporation paid for purchases by Campbell during the 1948 Christmas Season, as follows: 21 fruit cakes, $152.82; liquor, $186.68; candy, $3.06; and other gifts $8.78; total, $351.34. The corporation made gifts of fruit cakes, candy, liquor, and other similar items which *200 cost $325.50, to individuals with whom it did business, to one employee, and to employees of business concerns giving services to the corporation. None of such purchases were for Campbell's use or benefit. There were 4 purchases which cost $25.84, which were sent to personal friends of Campbell. He realized taxable income in 1949 in that amount through the corporation's payment for such gifts. The corporation's expenditure of $325.50 was not a distribution of income to Campbell. Apartment Entertainment: In September 1950, the corporation paid Otis & Lee, caterers, $162.75 for the refreshments served at a cocktail party given in the Chicago apartment for a group of magazine wholesale dealers with whom it did business. They were attending a convention in Chicago. This expense was directly related to the corporation's business and was not payment of any personal expense of the petitioner. Petitioner did not realize therefrom income of $162.75. European Trip, 1950: Campbell and his wife took a trip abroad in the summer of 1950 which extended through 64 days. They visited cities in Holland, Belgium, Switzerland, France, England, and Ireland. They left Chicago at some time before June 30, *201 1950. They sailed from New York City on June 30 and arrived at Rotterdam on July 8. On their return trip, they sailed from England around August 26 and arrived in New York on September 2. Campbell made the reservations and arrangements for the trip at the Chicago office of the American Express Company. He carried a letter of credit through which he cashed drafts in Lucerne and Paris. Kable News paid the drafts and certain bills. It also reimbursed Campbell for cash expenditures and amounts he paid to American Express. Kable News did not receive any itemized bills or statements. It made the various payments related to the trip without any question and without inquiring about the nature and amount of any particular expense. Campbell did not submit to Kable News any expense account or any itemized statement of either the general expenses or of his cash expenditures; and he did not keep any records thereof. The corporation disbursed the total amount of $8,291.16 for the round trip and cash expenses of the petitioner and his wife in connection with their trip abroad. The parties have stipulated that Kable News made disbursements with respect to the European trip in the amounts, on the dates, *202 and for the purposes set forth in the following schedule. The stipulation is limited to the following: 1950
Items
Amounts
3-23
Deposit Am. Exp. S.J.C.
space to Europe
$ 100.00
6-12
Am. Exp. due S.J.C. to
Europe
1,450.00
6-12
Cont. Ill. Bk. (trav. checks,
S.J.C.)
503.75
6-30
Am. Exp. due S.J.C. to
Europe
680.00
6-30
Am. Exp. due S.J.C. accom-
modations to Europe
2,984.41
7-31
Draft from Lucerne, S.J.C.
505.00
7-31
Draft from Paris, S.J.C.
303.00
8-28
S.J.C.
250.00
8-31
S.J.C.
1,515.00
$8,291.16
The record does not show anything about the detailed expenses of the trip, such as the cost of the accommodations aboard ship of the petitioner and his wife; the cost of traveling expenses on the Continent, in England, and in Ireland; hotel expenses abroad during the entire trip; the costs of meals, tips, incidental expenses, entertaining, and other kinds of expenses during the entire trip. Kable News, in its 1950 return, deducted as the expense of business traveling the total amount of $8,291.16. The Commissioner disallowed the entire expense. The respondent included in petitioner's taxable income for 1950 $8,291.16 as personal expenses paid by Kable News. Before the second World War, Kable News sold magazines of its United States *203 publishers to two wholesale distributors of magazines, Gordon and Gotch and Atlas Publishing & Distributing Company (referred to as Atlas). Gordon and Gotch have an office in London and other offices in Australia and New Zealand. It was the main wholesaler with which Kable News did business overseas before the war. Atlas has its office in London and its managing director is W. J. Dexter. The war brought to an end all of such foreign business of Kable News. At some time after the end of the war, Kable News resumed some limited business with Atlas which was restricted by limitations on the importation of popular magazines by the British Government. Such restrictions on importations of magazines into England existed in 1950. In 1950, Kable News was sending some magazines to England. Government controls of foreign exchange in 1949, 1950, and thereafter made it difficult to export magazines to British wholesalers. Dollar exchange for magazine purchases in England was limited. Under these circumstances, some publishers in the United States made contracts with British publishers granting them reprint rights to publish American magazines in England. However, there were shortages of paper for *204 such purposes in England at various times. After the end of the war, there were similar restrictions on imports of magazines and similar foreign exchange controls by the governments of some European countries in which, also, there were shortages of paper for printing magazines and shortages of dollar exchange. After arriving in Rotterdam on July 8, Campbell and his wife were on the Continent 14 days, until July 21; they arrived in London on July 22 and remained there 7 days until about July 29. They then went to Ireland where they remained for at least 3 weeks during August, after which they returned to London and departed around August 26. While on the Continent, they spent 2 days in Amsterdam, 2 days in Brussels, about 6 days in Switzerland, and 4 days in Paris. During the entire trip abroad, the presence of Ileen Campbell was not required or necessary for the business of Kable News. Part of Campbell's trip abroad was not required or necessary for the business of Kable News. In particular, no necessary or bona fide business purpose related to the business of Kable News was served by Campbell's visit in Ireland, and that visit was for personal reasons. Some part of Campbell's trip *205 abroad had a business purpose directly related to the business of Kable News, but such necessary and bona fide business purpose did not require a trip of two months' duration. During the entire trip, Campbell engaged in some personal and recreational pursuits. Of the total sum of $8,291.16 paid by Kable News in connection with the trip of the Campbells, no more than $2,491.16 represented ordinary, reasonable, necessary business expenses of Kable News for travel, lodging, meals, business entertainment, and incidental expenses of Campbell; and at least $5,800 was spent for the nonbusiness, personal expenses of Campbell and his wife for traveling, hotels, meals and incidentals. Unexplained Railroad Expense, 1950: On August 31, 1950, Kable News paid the Ritz Carlton Hotel in New York City $142.54 for 2 railroad tickets and a drawing room from New York City to Chicago, which were obtained by the hotel porter and charged to Kable News on or about August 13. Kable News has no record establishing any facts about who used the railroad tickets or the purpose of the expense. In auditing the corporation's return for 1950, the Commissioner disallowed the deduction taken by it for this expense. The *206 respondent included this item of expense, $142.54, in the petitioner's taxable income for 1950. The petitioner failed to prove that these railroad tickets were not used by himself and his wife, upon returning from their trip abroad, for their transportation from New York to Chicago. Part of such expense was incident to the business portion of petitioner's trip overseas, $71.27, which amount was a business expense of the corporation; and $71.27 was personal expense paid by the corporation, and therefore, income to petitioner. Expenses of Wife's Travel: The petitioner took 2 business trips from Chicago to New York at the end of January and the end of March in 1949. His wife was with him during these trips. She followed him after he went to New York in January; she accompanied him on his trip in March. In each instance she was in New York 4 or 5 days, including week ends. The cost of Ileen's railroad expense on the January trip was $97.92, which was paid by Kable News and deducted by it as a business expense, which the respondent disallowed. The corporation paid the bill of the Ritz Carlton Hotel, where the Campbells stayed. It was $642.84. The corporation deducted that amount as a business *207 expense. The respondent allowed the corporation a business expense deduction of one-half of the hotel expense and denied a deduction for the balance, $321.42. He determined that the corporation paid personal expenses of the petitioner in the amounts of $97.92 and $321.42, and included these amounts in the taxable income of petitioner for 1949. The Campbells were in New York during the second trip from March 31 to April 5, 6 days. They stayed at the Ritz Carlton. Their hotel bill was $338.55. Their round trip railroad expense was $382.95. The corporation paid all of the above expenses and took deductions for the entire amounts. The respondent denied the corporation deductions for one-half of each item; he allowed deductions for one-half of each. He attributed one-half of the hotel and railroad expenses to the cost of Ileen's trip and determined that Kable News had paid personal expenses of the petitioner in the respective amounts of $169.28 and $191.47 for hotel and traveling expenses. The petitioner took a business trip to New York on April 16, 1950, and was there a few days. His wife went along. Their railroad expense, $243.69, was paid by Kable News and deducted as a business expense, *208 of which the respondent allowed a deduction of one-half. He attributed the other half, $121.84, to the cost of Ileen's trip and determined that the corporation had paid a personal expense of the petitioner in that amount, which he included in petitioner's taxable income. In May, petitioner went to New York to attend to business of Kable News. His wife went, also. Their railroad expense was $211.84, which the corporation paid; it deducted the whole sum as a business expense; the respondent allowed one-half. The respondent allocated one-half, $105.92, to the expense of Ileen's trip and determined that the corporation had paid a personal expense of the petitioner in that amount, which he included in petitioner's taxable income. The presence of petitioner's wife during the 4 New York trips served no real business purpose closely related to the conduct of the business of Kable News and she did not render any services directly to the corporation. The petitioner entertained at dinners executives of concerns and others with whom the corporation did business, and their wives, during at least three of the trips, and his wife assisted him on these occasions; but her assistance was solely of a *209 social nature such as an interested wife would give and was not directly related to any business matter of Kable News. The petitioner failed to establish that his wife's activities were during the trip taken in April 1950. The corporation paid personal expenses of the petitioner in 1949 and 1950, from which he realized taxable income, in the respective amounts of $780.09 and $227.76. Entertainment Expenses: The International Livestock Exhibition is held in Chicago, late in November, each year; it extends through 8 days, from about November 26 through December 3. There are programs and shows presented every evening and about every other afternoon. The entertainment offered includes horse shows and cattle shows. There are 6 seats in a box. The purchaser of a box obtains 48 admissions to evening shows and 24 admissions to matines during the entire exhibition. Kable News purchased a box at this exhibition for the 1949 and 1950 seasons. The price paid was $270 in each instance. The Saddle and Sirloin Club is located in the Union Stockyards in Chicago. The petitioner was a member of this club during the taxable years. The club serves meals and drinks to members and their guests. The petitioner's *210 bill at the club during the 1949 livestock exhibition amounted to $359.83. Kable News paid the bill. The petitioner and his wife and guests attended the livestock exhibition during the 1949 and 1950 seasons. Among those who were guests were people associated with publishing and wholesale firms in the Chicago area with whom Kable News did business. Petitioner did not keep any list of the people who were invited to attend or given tickets during the 1949 and 1950 seasons. Some of the guests were personal friends of the Campbells who did not have any business transactions with the corporation. The Campbells and their guests always went to the Saddle and Sirloin Club for dinner before the evening shows during the livestock exhibition. The petitioner did not keep any record of the guests entertained at the club or the costs of dinners, during the 1949 season, which amounted to $359.83, and he did not make any estimates of what was involved in the total cost. Kable News took deductions for the costs of the boxes and the club charges. The respondent disallowed the deductions, and determined that such expenses were petitioner's personal expenses. He added those amounts to petitioner's income *211 for 1949 and 1950, respectively, on the ground that the petitioner realized income through the corporation's payments of his personal expenses. Before the livestock exhibition in Chicago in 1949, the petitioner attended the Royal Winter Horse Show in Toronto, on October 11. His wife did not go along. Kable News paid $75 for 3 seats at this horse show for the petitioner and 2 guests. One guest was connected with the Bank of Montreal, where the corporation had an account; the other guest was associated with the Canadian Gravure Printing Company with which the petitioner was then making some contacts for Kable News. The respondent determined that this expense was petitioner's personal expense and included it in his income after denying the corporation a deduction therefor. Beginning on November 1, 1949, through November 8, for 8 days, the National Horse Show was held in Madison Square Garden in New York City. Kable News paid $378 for a box for the entire period. The petitioner and his wife attended the horse show, including a reception held on November 1. They stayed at the Ritz Carlton during this period, from October 30 to November 9. Their hotel bill was $775.64, which Kable News paid. *212 The Campbells entertained at the horse show and at dinners at the Ritz Carlton. Among their guests were people associated with publishing concerns whose magazines were sold by Kable News. The petitioner did not keep any records of the persons invited to dinner and the horse show, or of the costs of dinners at the hotel. The respondent determined that the entire expenses of the box and the hotel bill were income of the petitioner, after denying the corporation deductions therefor. Interests in Livestock and Horses: The petitioner raised beef cattle, for sale, at his farms in Mount Carroll, where he also kept hackney horses, which he showed at exhibitions. In 1949 and 1950, he was a member of the American Hackney Horse Society. During 1949 and 1950, petitioner took trips during which he showed his hackney horses, bought cattle, and attended country fairs and horse shows. Examples of petitioner's interests in livestock and horses are the following activities which took place in 1949 and 1950: 1949: During a business trip to New York which began on March 30, the petitioner attended a sale of Aberdeen Angus cattle in Rhinebeck, not far from New York City, at the Ankony Farm. En route to *213 New York during a business trip in April, he and his wife spent several days with friends in Devon, Pennsylvania, where they attended the Devon Horse Show, after which they proceeded to New York. In July, he flew to Detroit where he bought 3 horses. Early in September, he went to Indianapolis, Indiana, where he showed horses at the Indiana State Fair. Toward the end of September he went to a horse show in St. Louis. On November 14, he went to Toronto to attend the Royal Winter Fair, which includes livestock shows, and while there he bought some Aberdeen Angus cattle. Also, on October 20, he went to Harrisburg, Pennsylvania, to attend the Pennsylvania National Horse Show. 1950: In January, petitioner attended meetings of the directors of the American Horse Show Association in New York City. In May, he attended the Devon Horse Show in Devon near Philadelphia. Cash Allowances of Kable News: The petitioner followed the practice throughout 1949 and during 7 months in 1950 of obtaining cash from the corporation's treasurer every few weeks in the amounts of $100, $200, or $250. These cash allowances purportedly were petitioner's business expense allowance. He determined the amount and the *214 time of each withdrawal, and could request cash freely. There were no restrictions upon his use of the cash; he was not obliged to submit any expense account to the corporation showing how, why, when, and how much he spent; he determined the use to be made of the cash; and he did not repay or return any of it to the corporation. Hereinbefore, there are set forth schedules showing the dates and amounts of the payments of cash to the petitioner. In most instances, checks of the corporation were made payable to petitioner's secretary in an amount slightly largely than what the petitioner received; the secretary kept the difference for petty cash office expense. On the corporation's books all of the checks were explained as "traveling expense". The cash payments which petitioner received amounted to $2,971.34 in 1949 and $1,976.69 during the first 6 months of 1950 and September. In addition, the corporation purchased in June 1949, 26 tickets for $591.50 to the Charles-Walcott fight in the Chicago Stadium, so that the total cash in 1949 was $3,562.84. Petitioner was abroad during July and August 1950; there is no explanation for the absence of cash payments in the last 3 months of 1950. *215 The total amounts of cash paid to petitioner in each month were as follows: 1949
1950
January
$ 100.00
$ 450.00
February
112.08
216.05
March
309.51
360.64
April
300.00
200.00
May
251.50
200.00
June
100.00
350.00
July
200.00
0
August
200.00
0
September
250.00
200.00
October
452.25
0
November
450.00
0
December
246.00
0
$2,971.34
$1,976.69
The corporation deducted as business expense in its 1949 return $3,562.84 (which included the amount paid for the Charles-Walcott fight tickets); it deducted $1,976.69 in its 1950 return as business expense. Because the corporation could not substantiate these deductions as bona fide, necessary business expenses, the respondent did not allow it deductions for the entire amounts; but he made an approximation of allowable amounts for deductible business expenses under the rule of the Cohan case, supra, and IR Mimeograph 54-92, dated May 25, 1954, which was promulgated as Rev. Rul. 54-195. See 1954-1 C.B. 47. He accordingly allowed the corporation deductions of one-third of $3,562.84 for 1949, or $1,187.61, and one-third of $1,976.69, or $658.89, for 1950, which were his approximations. The respondent also determined, for lack of substantiation, that the amounts of the deductions which he *216 denied the corporation represented payments of petitioner's personal expenses and, therefore, were income of petitioner, and he added to petitioner's income two-thirds of the total cash disbursements, $2,375.23 for 1949, and $1,317.80 for 1950. In its returns for 1949 and 1950, Kable News took deductions for administrative expenses which included deductions for administrative traveling and entertainment expenses of $44,481.64 for 1949, and $40,866.83 for 1950. Included in these sums were certain traveling expenses of the petitioner which the respondent did not question and therefore are not involved here, for the petitioner took business trips relating to the corporation's business to New York City and elsewhere during 1949 and 1950 requiring the corporation's payments of transportation and other expenses which the respondent did not question and are not involved here. The expenditures of the corporation which are in dispute, $7,965.70 for 1949, and $12,755.01 for 1950, were included in the above-stated amounts of administrative traveling and entertainment expenses, however. The record does not show the amounts of the unquestioned traveling, hotel, and related expenses of the petitioner *217 in 1949 and 1950, for which Kable News was allowed deductions. The items of transportation expenses which are in dispute here are limited to trips of petitioner's wife when she accompanied him to New York and Europe, and hotel expenses related to some of such trips, and to hotel expenses of the petitioner and his wife at the time of the National Horse Show in 1949. The petitioner took at least 7 trips to New York City and one trip to Los Angeles during 1949. In 1950, he took 3 trips to New York, one to French Lick, Indiana, one to Oklahoma City and Houston, and one long trip to Arizona with visits in several places en route during all of March. The petitioner attended a meeting of Pacific Coast magazine wholesalers in Los Angeles, in September 1949. He attended a convention of independent publishers and distributors of magazines in Houston early in February 1950, and stopped in Oklahoma City en route at a wholesaler's meeting. He presided over a meeting of Kable News sales representatives in French Lick, Indiana, May 16-18, 1950. The petitioner kept a small, pocket diary of his engagements during 1949 and 1950 in which he made note of the dates when he started on trips and the names *218 of persons he saw in Chicago, New York and some other places. However, he did not make any notations therein, or elsewhere, of any expense or expenditure which he incurred and paid. Such notes as he made in his dairy were very brief, such as would indicate merely engagements. There is not sufficient evidence to establish individual items of expense for any engagement or trip. During 1949 and 1950, the petitioner undoubtedly incurred and paid certain cash expenses in connection with the performance of his duties as the president of Kable News, such as entertainment expenses, expenses incident to trips apart from transportation and hotel expenses paid by Kable News, and other expenses, but there is not sufficient evidence to establish with any reasonable certainty the amounts of such cash expenses for business entertainment and other business purposes and, in particular, what amounts and what expenses were ordinary and necessary expenses directly related to the conduct of the business of Kable News. Under all of the circumstances and due to petitioner's failure of proof, a reasonable allowance for cash expenditures by the petitioner in connection with the performance of his duties as *219 the president of Kable News during 1949 and 1950, out of cash received from Kable News, directly related to the conduct of that corporation's business and for ordinary and necessary expenses of that business, was not more than $1,187.61 for 1949, exclusive of $591.50 paid for tickets to the Charles-Walcott prize fight; and for 1950, was not more than $658.89, as approximately by the respondent under the Cohan rule. With respect to the expenses for tickets to livestock and horse shows and the Walcott fight, Kable News spent $1,674.33 in 1949, as tabulated below, and $270 in 1950. For evening performances, only, the expenditures in 1949 for the International Livestock Exhibition, the Walcott fight, and the National Horse Show represented purchases of at least 122 tickets for admissions during 17 evenings. The 1949 expenditures were as follows: Walcott fight, June
$ 591.50
Royal Winter Horse Show, Oct.
75.00
Natl. Horse Show, Nov.
378.00
International Livestock, Nov.
270.00
Saddle & Sirloin
359.83
$1,674.33
The petitioner had a personal interest in livestock and horses and the exhibiting and showing of them. Kable News made purchases of boxes and seats to the exhibitions and shows in question because, *220 in part, of such interest of the petitioner. Also, because of such interest of the petitioner, he maintained and used a membership in the Saddle and Sirloin Club. Although petitioner undoubtedly invited to the shows representatives of publishing and wholesale firms with which Kable News did business, and some of the executives and representatives of the corporation, there is not sufficient evidence to establish with any reasonable certainty the numbers of such business people and associates who were invited to attend in 1949 and 1950 the International Livestock and National Horse shows, the numbers of such business guests as were entertained at the Saddle and Sirloin Club, and the costs of all of such entertainment of business guests. In addition, the evidence is not sufficient to establish what amount for 1949 of such total expense ($1,082.83), and what part of $270 in 1950 was ordinary and necessary expense directly related to the conduct of the business of Kable News. Furthermore, the petitioner entertained at the shows and dinners his wife and some personal friends, and such expenses, which cannot be ascertained with any reasonable certainty from the evidence, were not ordinary *221 and necessary expenses of and directly related to the conduct of the business of the corporation. In June 1949, there was a meeting for 3 days of Kable News sales representatives at the Sherman Hotel in Chicago and some representatives of publishing concerns. About 20 sales representatives of Kable News attended the meeting and several publishers' representatives. Kable News paid directly to the Chicago Stadium $591.50 for 26 tickets, $22.75, each, to the Charles-Wolcott fight. All of the tickets were used by those who attended the Kable News sales meeting. This expense was directly related to the conduct of the business of Kable News and was its business expense. The petitioner did not realize income because of this expense. Of the total sum spent in 1949 of $1,082.83, including $75 for the Royal Winter Horse Show tickets and the Saddle and Sirloin charges, not more than $541 was business expense of Kable News; and for 1950, not more than $135 was business expense of the corporation. Of these expenses, the corporation paid personal expenses of the petitioner and he realized income in the amount of $541.83 in 1949, and $135 in 1950. With respect to the bill of $775.64 of the Ritz Carlton *222 Hotel for the period October 30 to November 9, 1949, at the time of the National Horse Show, part of that expense was incurred for petitioner's wife and was a personal expense. During this visit to New York, the petitioner spent some of his time attending to some business of Kable News which involved negtgiations with representatives of the Chase National Bank for the purchase by the corporation of shares of its stock held in the estates of Warren Angel and his wife, and conferences with some representatives of magazine publishing concerns with which the corporation was doing business. The evidence is not sufficient to establish with any reasonable certainty the amount of the total hotel expense which represented a reasonable allocation of it to the cost of the business portion of the petitioner's trip and of necessary business entertaining at dinners at the hotel for persons doing business with the corporation. Such insufficiencies in the proof are due to petitioner's failure of proof. Not more than one-third of $775.64, hotel and entertainment expenses, or $258.55, was a necessary expense directly connected with the business of Kable News. The corporation paid personal expenses of *223 the petitioner of at least $517.09 in 1949, and he thereby received taxable income in that amount. In 1949 and 1950, petitioner received from the corporation income in the respective amounts of $1,783.73 and $1,317.80, consisting of cash allowances. Summary of Ultimate Findings: 1949: The respondent included in petitioner's income for 1949 $7,965.70. Of this amount, $6,249.15 is taxable income. The respondent's determinations were in error to the extent of $1,716.55, as tabulated below. 1950: The respondent included in petitioner's income for 1950 $12,755.01. Of this amount, $9,894.83 is taxable income. The respondent's determinations were in error to the extent of $2,860.18, as shown below: 1949
Taxable
Not
Items
Income
Income
Apartment
$2,385.57
0
Cash to Campbell
1,783.73
$ 591.50 * *224 Stop & Shop
25.84
325.50
Ritz Carlton
321.42
0
RR Tickets, N. Y.
97.92
0
RR Tickets, N. Y.
191.47
0
Ritz Carlton
169.28
0
Decorating Apt.
215.00
0
Shows
541.83
541.00
Ritz Carlton
517.09
258.55
$6,249.15
$1,716.55
1950
Apartment
$2,343.00
0
Cash to Campbell
1,317.80
0
RR Tickets, N. Y.
121.84
0
RR Tickets, N. Y.
105.92
0
RR Tickets, Chgo
71.27
$ 71.27
RR Tickets, Chgo.
71.27
$ 71.27
I. L. Show
135.00
135.00
Party, Apt.
0
162.75
Sub-total
$4,094.83
$ 369.02
European trip
5,800.00
2,491.16
$9,894.83
$2,860.18
Issue 2. On his farms at Mount Carroll, Illinois, covering about 2,500 acres, general farming operations are carried on. Two of the farms are known as the Argyle farm and the Glengarry farm. Corn, oats, alfalfa, hay, and soy beans are raised, most of which is used for feed; and cattle, hogs, and poultry are raised and sold. Farm income is reported on Form 1040F. In the taxable years, the operations of the farm and the selling of cattle, hogs, poultry, and some dairy and other produce was a business of Campbell. In the farm accounting and reporting of farm income, the petitioner reported income on an accrual basis and, therefore, used inventories in computing income. He took depreciation on such depreciable items as farm buildings, stable buildings and chicken houses, tractors and farm equipment, harness and saddles, and trucks. Cattle, horses, and other livestock were not depreciated under any depreciation method, along with farm buildings and equipment, because they were included in the inventory, which system is a standard one for accounting for livestock under certain conditions. Petitioner reported farm income for the taxable years in the following amounts: 1949; *225 gross receipts, $171,002.30; gross profit, $77,719.96; expenses and depreciation, $117,346.87; net loss, $39,626.91. 1950; gross receipts, $157,591.50; gross profit, $79,036.50; expenses and depreciation, $107,183.15; net loss, $28,146.65. Included in the gross receipts reported, were sales of livestock and produce of $80,981.55 in 1949, and $78,021.91 in 1950. Sales of livestock and hogs, alone, amounted to $77,782.85 and $72,892.56. At the Glengarry farm, petitioner kept about 12 riding horses. At the Argyle farm, in the Argyle Stables, he kept about 25 hackney horses. The hackney is a particular breed of horse which is not used in farming operations for draft or any such purposes. The hackneys were not used in any farm work. Separate accounting was not maintained for the riding and hackney horses. Income from and expenses of both types were included in the general farm accounts, and these horses were included in the inventories of livestock. The Frances Shimer College is located in Mount Carroll near the Glengarry farm. Petitioner was chairman of the board of trustees of the College. The riding horses were rented to students of the College, from which petitioner received $2,442.10 *226 in 1949, and $1,859.44 in 1950, which amounts were reported in farm income. Petitioner sold 10 riding horses in 1949, of which 2 had been held for less than 6 months, and 8 had been held for from 1 to 7 years. He sold the horses because they were either old or lame. From the sales of the 2 riding horses held for less than 6 months, a gain of $290 was realized, which was ordinary income. With respect to the other 8 riding horses, their total cost was $1,065; the total inventory cost at the time of the sales was $750; and the total selling price was $520. A total loss was sustained in 1949 from the sales of riding horses of $230. The petitioner showed the hackney horses at fairs and exhibitions, for which he received premiums and incurred expenses, and the expenses exceeded the premiums received, as follows: Show
Show
Year
Expenses
Premiums
1949
$17,472.20
$14,434.30
1950
17,301.39
16,094.65 The premiums received were included in gross farm income and the show expenses were included in general farm expenses in the farm accounts and returns. When the hackneys were shown at exhibitions they were not offered or advertised for sale and no offers to purchase any of them were received. Petitioner sold *227 8 hackneys in 1949 and 1950, 4 in each year; all had been held for more than 6 months. The lengths of time of the holding of the horses sold in 1949 were as follows: One had been held for 4 years; one for 2 years and 2 months; one for 1 year and 10 months; and one for 1 year and 2 months. The horses sold in 1950 had been held, two for 5 years and 8 months; one for 3 years and 8 months; and one for 2 years and 4 months. The hackneys were not advertised for sale. Word just got around that either the petitioner was willing to sell a horse or someone wanted to buy one, and petitioner's stable manager arranged for the sales. There was profit realized on each sale the amount of which was computed by using as the basis of each, its inventory value at the time of sale. The total gain was $2,630 in 1949 and $5,575 in 1950, as follows: 1949
Inventory
Basis After
Selling
Cost
Depreciation
Price
Profit
1.
$3,100
$1,000
$3,000
$2,000
2.
200
40
250
210
3.
50
40
200
160
4.
0
40
300
260
$2,630
1950
1.
$1,500
$ 300
$1,600
$1,300
2.
1,250
400
2,500
2,100
3.
1,250
400
2,500
2,100
4.
75
25
100
75
$5,575
In reporting farm income, the petitioner, relying on the provisions of section 117(j) of the 1939 Code, compared his gains and losses from the sales of *228 farm assets, and under that section he treated them as long-term capital gains and losses. In Schedule D of the 1949 return, he reported total long-term capital gain from the sales of all livestock, including the riding and hackney horses, in the amount of $6,833.05. Included therein was a net gain of $2,690 from the sales of both types of horses which erroneously included net gain of $60 from the sales of the 10 riding horses. That error consisted of treating $290, gain from riding horses held less than 6 months, as long-term capital gain. In Schedule D of the 1950 return, the petitioner included the gain of $5,575 from the sales of hackneys in other long-term capital gains totalling $47,688.14, part of which was from the sale of other livestock. The respondent determined that the riding and hackney horses were not property used in a trade or business of the petitioner within the definition contained in section 117(j) and, therefore, included as ordinary gain in petitioner's income for 1949 and 1950 the full amount of the net profit from the sales of both kinds of horses. Upon making such adjustment in petitioner's income for 1949, there remained, however, long-term capital gain, *229 which was allowed and was not adjusted, in the net amount of $4,199.05. The riding horses were not held primarily for sale to customers in the ordinary course of petitioner's trade or business; they were rental horses and were used in a trade or business of the petitioner. Since there were long-term capital gains in 1949 of $4,199.05, which exceeded the loss from the sales of riding horses, $230, the loss of $230 was a long-term capital loss. None of the hackney horses which were sold in the taxable years were held for draft, breeding, or dairy purposes. Petitioner's expectation of profit from his hackney horses was from sales thereof rather than from premiums received for showing them at exhibitions. The hackneys were held by petitioner primarily for sale in the course of his business. Opinion HARRON, Judge: Issue 1. The respondent made a series of determinations. Although the general question is whether petitioner realized income from payments by the corporation in which he is the chief executive and dominant stockholder within sections 22(a) and 115, 1939 Code, this question must be considered in connection with several items and types of payments. The petitioner has the burden *230 of overcoming the prima facie correctness of the respondent's determinations. The respondent's determinations require that the petitioner prove that no income was realized from payments by Kable News, or less income. The pleadings present only the broad claim that the corporation made all of the expenditures in the conduct of its business and that the full amount of each item was business expense and, therefore, none of the disputed amounts represented income of the petitioner. The petitioner does not contend that the corporation made any gifts. There was no amendment of the petition either to conform to proof or to raise any new issue. Under our Rules, only questions presented by the pleadings will be considered; a question presented on brief which is not placed in issue by the pleadings will not be considered. Rule 7(c) 4(B) (4), Rules of Practice; F. H. Philbrick, 27 T.C. 346, 353; Irving Segall, 30 T.C. 734, 741; Samuel E. Hirsch, 16 T.C. 1275, 1279; Sicanoff Vegetable Oil Corporation, 27 T.C. 1056, 1066. In the first instance, the Commissioner denied Kable News deductions taken in its returns because, in many instances, they could not be substantiated. He then determined that *231 the amounts of disallowed corporate deductions constituted income to petitioner. Throughout many of the items involved, the underlying problem originates in petitioner's failure to keep records of expenses. However, there is no suggestion, and none would be warranted, that the lack of records indicates a tax avoidance purpose. On the other hand, the respondent argues that since the petitioner has taken inconsistent positions about certain matters, the credibility of his testimony is subject to question and the record should be scrutinized carefully. The respondent contends that much of petitioner's testimony is not corroborated and is self-serving and, accordingly, is not entitled to receive a great deal of consideration. All of the record and the arguments of the parties have been considered with the utmost care. In view of the great quantity of detail in the record, it has been necessary to trace, check, and recheck a mass of data and points. With respect to specific questions under the broad issue, we have reviewed several well-established rules and principles. Consideration is given to the various items separately and according to the classes of expense into which they fall. Purchases *232 and Apartment Expenses: The corporation's treasurer identified all of the purchases at the Stop & Shop Store and the recipients thereof to whom gifts were made during the Christmas season of 1948. The evidence establishes that none of certain purchases costing $325.50 were given to personal friends of or used by the petitioner. They were business gifts of the corporation. The respondent erred in including $325.50 in petitioner's income. Only $25.84 was paid for purchase of gifts to friends and personal associates of petitioner, as petitioner now concedes. Petitioner realized income in 1949 from these expenditures in the amount of $25.84. Beginning on September 25, 1950, there was a meeting for several days at the Sheraton Hotel in Chicago of publishers of pulp magazines and wholesalers, with many of whom Kable News did business. The corporation gave a cocktail party at the apartment which it leased and engaged Otis & Lee, caterers, to provide and serve refreshments and supper. The party was not given by the petitioner, individually. He entertained 40 wholesalers who were customers of the corporation in his capacity as president. The cost, $162.75, was directly related to the corporation's *233 business and was its business entertainment expense. Petitioner did not personally benefit and his personal expenses were not paid. The respondent erred in including this amount in petitioner's income for 1950. The Chicago Apartment: The items of expense paid by the corporation involved under this category are: For 1949, rent and utilities, $4,771.14; redecorating the apartment $430, total for 1949, $5,201.14; for 1950, rent $4,686. The respondent allowed the corporation business expense deductions for one-half of the above amounts and included in petitioner's income the balance, $2,600.57 for 1949, and $2,343 for 1950. The petitioner contends that all of such expenses were business expenses of the corporation and that he did not realize any income through the corporation's payments of rent and other charges. Petitioner's position is not clear. These items are not dealt with separately in the petition, which alleges only general error in the determinations that income was realized in each year in the total amounts of all of the particular items. However, in a memorandum (signed and sworn to by the petitioner) filed on behalf of the petitioner with the respondent before the final determinations *234 were made (which was received in evidence as an exhibit of the respondent), it was said that the petitioner and his wife stayed at the apartment whenever petitioner was in Chicago attending to the petitioner's business and thereby saved hotel expenses which, it was alleged, would have been deductible. The latter question is not before us, of course, and we shall not deal with it; but, in passing, it may be noted that such contention (about alternative hotel expense) is surrounded with doubt and would require proof. Cf. Commissioner v. Flowers, 326 U.S. 465. The evidence shows the following: Kable News has its main office in Mount Morris, which is 120 miles west of Chicago, and it maintains an office in Chicago and another in New York City. The petitioner was in charge of the Chicago office where he was assisted by one employee, his secretary. All of the promotion and sales work of Kable News' business is done in the Chicago and New York offices. At the Mount Morris office the accounting, traffic, and returns departments are located. All sales records are kept in New York. The corporation's main bank account is in a Chicago bank; its pension plan is administered in Chicago, where *235 the pension plan attorney is located; and from the Chicago office, business in that western area is solicited and handled. Campbell did a great deal, if not the chief amount, of his work from the Chicago office; he went to the New York office frequently; he took business trips for Kable News to the west and south from Chicago. At times he was at the Mount Morris office, but the record does not show the frequency or length of such visits. The petitioner has his home in Mount Carroll, which is 30 miles from Mount Morris and 128 miles west of Chicago. The Campbells kept personal belongings and clothing at the Chicago apartment at all times, and employed a full-time maid at the apartment. It was Campbell's routine to spend his week ends at his home in Mount Carroll and to go to Chicago on Monday night or Tuesday morning and remain there until Friday. He and his wife stayed at the apartment during the week. Some of the executives of Kable News stayed at the apartment while visiting Chicago. Martin, its treasurer and accountant, stayed there about 10 times a year, but not always, as he also stayed at a club in Chicago, to which he belonged, an equal nummer of times. Some of those with whom *236 Kable News did business were guests at the apartment from time to time, and the apartment was used for business entertaining. The petitioner testified that he and his wife occupied the apartment during about 40 weeks of each year, i.e., when he was not on vacation or trips. The only inferences to be drawn from all of the record is that the apartment was the Chicago residence of the Campbells and was not merely a place where they stayed occasionally, casually, or infrequently; and, also, that the petitioner's attendance at the Chicago office was substantially continuous, except for short absences on trips and vacations. It was not convenient or agreeable for the petitioner to commute daily between Mount Carroll and Chicago. It is evident (and there is nothing to the contrary in the record) that the petitioner's occupancy of an apartment leased by his employer saved him family living expenses in Chicago which, otherwise, he would have incurred and paid. It is not claimed that the corporation made a gift to petitioner each year of the rental value of the apartment and there is no evidence of any such intent. We find that the corporation did not make a gift of the rental value of the apartment *237 to petitioner. There is no support in the record for treating petitioner's occupancy of the apartment as essential to the corporation in the conduct of its business. Indeed, no such contention is made. Furthermore, he occupied the apartment as an individual. The so-called convenience of employer rule has no application here. Cf. Arthur Benaglia, 36 B.T.A, 838; dismissed, 97 F. 2d 996. Petitioner did not pay the corporation any amount for the use of the apartment, utilities (1949), or decorating expense, and had no intention of doing so. It appears to be well settled that where funds of a corporation are expended for the personal use or economic benefit of an officer, employee, or stockholder, or his immediate family, particularly in cases where a dominant or controlling stockholder is the beneficiary, or the corporation is closely held, there being no gift and no intention of repayment, the amounts so disbursed by the corporation constitute income of such beneficiary under section 22(a), or additional compensation for services, or the equivalent of corporate distributions, notwithstanding the informality of the arrangement. It is immaterial that such beneficiary had no agreement *238 with the corporation that the value of what he enjoyed or received would be in lieu of compensation. The broad definition of gross income in section 22(a) includes "gains or profits and income derived from any source whatever." See Alex Silverman, 28 T.C. 1061, 1064, affd. 253 F. 2d 849; Casper Ranger Construction Co., 1 B.T.A. 942; L. J. Christopher [Dec. 4399], 13 B.T.A. 729, affd. 55 F. 2d 527; C. W. Murchison, 32 B.T.A. 32; Ned Wayburn, 32 B.T.A. 813, 816; Charles A. Rogers, 38 B.T.A. 16, 22, affd. 111 F.2d 987; Jesse S. Rinehart, 18 T.C. 672; Louis Greenspon, 23 T.C. 138, 151, reversed on other grounds 229 F. 2d 947; Oreste Casale 26 T.C. 1020, 1024; Commissioner v. Bonwit, 87 F. 2d 764, certiorari denied, 302 U.S. 604; Paramount-Richards Th. v. Commissioner, 153 F. 2d 602; Lash v. United States, 221 F. 2d 237, certiorari denied 350 U.S. 826. Also, it has been held frequently that rent-free use of corporation property by a stockholder or officer results in his realization of income, where there is no gift, and under a variety of circumstances. Charles A. Frueauff, 30 B.T.A. 449 (rent-free use of corporation's apartment); Reynard Corporation, 30 B.T.A. 451 *239 (rent-free use of corporation's house); Percy M. Chandler, 41 B.T.A. 165, affd. 119 F. 2d 623 (rent-free use of corporation's apartment and lodge); Paulina duPont Dean, 9 T.C. 256 (rent-free use of corporation's house); J. Simpson Dean v. Commissioner, 187 F. 2d 1019, affirming a Memorandum Opinion of this Court (rent-free use of corporation's house); Rodgers Dairy Co., 14 T.C. 66 (personal use of corporation's automobile). The corporation paid for gas and electricity and redecorating charges in 1949, in addition to rent. Such payments were just as much for petitioner's use and benefit as the payments of rent and must be treated in the same way. The respondent's determinations that one-half of the rent, utilities charges, and decorating expense paid by Kable News constituted taxable income of petitioner in 1949 and 1950 are sustained. The following groups of items include payments of cash and reimbursements to the petitioner by the corporation for traveling expenses of himself and his wife, entertainment expenses, and cash allowances. With a few exceptions, they consist of payments of cash to petitioner and of expenses which he charged to the corporation. At the outset it must *240 be concluded that the respondent acted properly in including such sums in petitioner's income. Under section 22(a), the petitioner was required to report income from all sources "of whatever kind and in whatever form paid." Under Regulations 111, section 29.23(a)-2(b) and (c), he was required to include in gross income reimbursed traveling expenses and allowances received in connection with his employment. It was error for petitioner not to include in his gross income for each year the cash which he received directly from the corporation, as allowances for various purposes and reimbursements, and indirectly in payment of expenses connected with his employment which he incurred and charged to the corporation. We must approve the respondent's action in including all of such items in petitioner's gross income. That was the correct procedure. Cf. Lucien I. Yeomans, 5 T.C. 870, 874; Silverman v. Commissioner, 253 F. 2d 849, 853, affirming 28 T.C. 1061. Section 22(n)[1] *242 defines "adjusted gross income" as gross income minus expenses deductible under section 23, including traveling expenses. Petitioner's obligation to report all of his income from every source, in whatever form and kind *241 paid, carried with it the right to take allowable deductions under sections 22(n)(2) and (3) and 23(a)(1)(A), which could be substantiated. He could not avoid, however, the necessity of proving what items were deductible under the above sections of the Code, and the amounts thereof, by resorting to the expedient of omitting amounts of income actually received from his gross income in his returns. Cf. L. L. Moorman, 26 T.C. 666, 675-676. Although the general issue is framed in such way that we are asked to determine whether the petitioner realized and received income in each year, the individual questions properly are whether the petitioner is entitled to deductions under section 22(n) from the gross income determined by the respondent for the purpose of computing adjusted gross income. See Patterson v. Thomas, 289 F. 2d 108 (March 16, 1961), reversing an unreported decision of U.S.D.C.N.D. of Ala., Nov. 12, 1959. See, also, Regulations 111, section 29.22(n)-1. Of course, since the petitioner failed to report these items in his gross income, he likewise did not take any deductions with respect to any of them. It is noted, also, that the corporation accepted and did not contest the Commissioner's disallowances of deductions in 1949 and 1950 of the amounts of the several items which, in turn, he determined to be includible in petitioner's income. The corporation could not substantiate its deductions through any records or in any way, or establish that they were ordinary and necessary business expenses. It is not material that the corporation did not contest the disallowances *243 of deductions. One explanation offered by the petitioner is that the corporation had a net operating loss for 1950, substantially larger than the total amount of the denied deductions for 1949 and 1950 and large enough to carry back to 1949. This explanation also is immaterial. However, the corporation's action shifted to the petitioner the burden of proving that the expenditures were directly related to the corporation's business and were ordinary and necessary business expenses. Furthermore, the respondent's determinations require that petitioner prove that cash received both directly and indirectly from the corporation was not used for personal, living, or family expenses, deductions for which are prohibited by section 24(a)(1), and that in general he did not receive or realize net income. Cf. Moses Mitnick, 13 T.C. 1, 4. The respondent allowed deductions to the corporation for parts of several items of expense. For 1949, out of deductions of $12,436.05, he allowed the corporation deductions totaling $4,470.35; for 1950, out of total deductions of $15,984.67, he allowed deductions of $3,229.66. For some items of expense, no deductions were allowed. Since the corporation did *244 not have any records to substantiate certain expenditures, the respondent made approximations of reasonable amounts of allowable deductions under the Cohan rule and a ruling issued as a guide in making such approximations. See 1954-1 C.B. 47, Rev. Rul. 54-195. European Trip, 1950: The respondent's determination is that no necessary business of Kable News required the European trip of either Campbell or his wife, that it was taken by them for their personal interests and pleasure, and therefore Kable News spent $8,291.16 for their personal expenses. The respondent included the entire cost of the trip in petitioner's taxable income. It has been stated above that it is well established that payment by an employer of the personal expenses of an employee results in the employee's realization of income. Since the respondent's determination presumably rests on a correct determination of the facts, Old Mission Portland Cement Co. v. Commissioner, 293 U.S. 289, the burden is upon the petitioner to adduce sufficient evidence as to the nature of the expenditures to show that they were not personal and family expenses. Cf. L. L. Moorman, supra, pp. 676, 678-9. He must prove, also, the amounts *245 of the individual items of expense involved, particularly where a large total figure is in issue. In short, he must prove the "where", "when", "why", and "how much" of each item of expense and that he paid the expenses. The petitioner contends that the entire trip was a business trip having the primary purpose of exploring the possibilities of arranging for foreign distribution of magazines handled by Kable News during which he called on several wholesale distributors of magazines in several European cities. He contends, further, that it was necessary for his wife to go with him to assist him in business entertainment and that the costs incident to her trip were necessary business expenses of Kable News. He claims that none of the expense was personal and none represents taxable income. As is the situation regarding all of Campbell's expenditures, no record was kept of any of the expenses of the trip. He did not give Kable News any accounting for the expenses. Martin, the treasurer of Kable News, at the trial, could not furnish any breakdown whatsoever of the total cost. Martin testified that Kable News did not have any itemized bills from American Express or any other source. The *246 amount involved, $8,291.16, is substantial. Petitioner's burden of proof required that he establish, inter alia, the actual costs of such items as the accommodations aboard ship which were purchased for himself and his wife going to and returning from Europe, their traveling expenses abroad, their hotel expenses, and their expenses for meals, business entertaining, and all of the incidentals. Even though the petitioner kept no records of his expenses, it must be assumed that he had knowledge of approximately what each of such items of expense was and the amount of each. He made most, if not all, of the arrangements for the trip; he spent the money involved; and it is unreasonable for him to take the position that he has no knowledge of what these expenses were. Nevertheless, the petitioner made no effort during the trial, under his burden of proof, to break down the total sum involved into any categories of expense. All that we know about the expenses of the trip are that the cash spent by Campbell amounted to at least $3,076.75, for which he was reimbursed by the corporation, and that there were other expenses of $5,214.41 which appear to have been paid to American Express Company, *247 but we do not know what the items covered by the latter figure were. Since petitioner contends that all of this general item of expense did not represent any personal, living, or family expenses (see section 24(a)(1)), it is a corollary of such contention, and therefore a matter he must prove, that all of the expenses totaling $8,291.16 were under section 23(a)(1)(A) ordinary and necessary, reasonable, and directly attributable to the conduct of the business of Kable News, even though under the pleadings the petitioner has not made any claim for any deductions, per se. It is well established that where a taxpayer claims that expenses are business expenses, he has the burden of proving the above. Louis Bochm, 35 B.T.A. 1106, 1109; Chas. D. Long, 32 T.C. 511, 513, affd. 277 F. 2d 239; Welch v. Helvering, 290 U.S. 111; Alexander P. Reed, 35 T.C. 199. We shall consider, first, petitioner's proof about the business purpose and necessity of Ileen's presence during the trip. There is no evidence that she performed any particular services. Petitioner relies upon his general testimony that entertaining was a necessary part of his business trip and that he regarded his wife's presence *248 with him on such occasions as desirable and helpful. His testimony is self-serving and little weight can be given to it in the absence of proof that his wife's presence served a bona fide and necessary business purpose directly and proximately related to the business of Kable News. There is no such proof. Assuming that Ileen acted as his hostess when he entertained and was helpful in this respect, the evidence does not establish that her services during the trip were necessary, even though they may have been helpful, or that she did anything more than what might be expected of an interested wife. Furthermore, the evidence is not sufficient to show that whatever the expenditures were which were incurred for Ileen's presence during the trip were not family and personal expenses, as the respondent has determined. His determination has the presumption of correctness which the petitioner has failed to overcome. We have not been given any evidence from which we can determine accurately, or even make an estimate of, the amount expended for and incident to Ileen's presence on the trip. Thus, it is impossible to make any finding that any part of the total expense attributable to her trip constituted *249 reasonable and necessary business expense. All that we know is that she accompanied petitioner on and throughout the trip. In Alex Silverman, supra, we said: It is well established that amounts expended by a taxpayer for the purpose of having his wife accompany him on a business trip where the wife's presence did not serve a bona fide business purpose represent nondeductible personal expenses under the provisions of section 24(a)(1), 1939Code. Leland D. Webb, 1 B.T.A. 759; George W. Megeath, et al., 5 B.T.A. 1274, 1287; Walter Schmidt, 11 B.T.A. 1199; Regs. 118, sec. 39.24(a)-1, and sec. 39.23 (a)-2; Rev. Rul. 55-57, 1955-1 C.B. 315, If such personal expenses as the wife's traveling expenses are paid by the employer directly or under reimbursement, they are not deductible by the husband-employee as business expenses or traveling expenses while away from home in the pursuit of business, notwithstanding such payment by the employer. Baxter D. McClain, 2 B.T.A. 726. The petitioner has failed to show that his wife's presence during the trip had a necessary, bona fide business purpose. It is concluded that her trip was primarily for her recreation and pleasure. It is held that *250 the amount paid by the corporation for the expenses incurred for Ileen's lodging, meals, incidental expenses, and travel during the European trip represented the payment of personal and family expenses which were properly included in petitioner's taxable income. Cf. L. L. Moorman, supra, p. 679; Edgar A. Basse, 10 T.C. 328, 342-343; Rev. Rul. 55-57, 1955-1 C.B. 315; Louis Greenspon, supra, p. 151. See also, Rev. Rul. 56-168, 1956-1 C.B. 93, 94, which deals with problems resulting when a member of a taxpayer's family accompanies him on a trip where opportunities exist for enjoying a personal vacation; and Patterson v. Thomas, supra. We turn now to consideration of the record relating to the alleged business purpose of Campbell's trip. He relies chiefly upon his own testimony. There is a question about the credibility of his testimony. Petitioner made an effort to corroborate part of his general contention but such material is scant. Respondent, upon cross-examination, introduced evidence about inconsistencies in petitioner's position before the final determinations were made. Because of the problem of the credibility of petitioner's testimony and the large sum at issue, it *251 is necessary to discuss the record, which has been thoroughly and carefully considered. Kable News before the recent war had some foreign distributions of magazines of United States publishers. The record does not show the volume or nature of that business, or with which foreign wholesalers Kable News dealt other than Gordon and Gotch and Atlas Publishing Company, both having offices in London. During and after the war the importation of United States magazines was not allowed in certain countries which would not give import licenses to wholesalers within such countries for the importation of magazines. After the war, also, restrictions on foreign exchange limited the availability of American dollars in foreign countries for the purchase of imports of magazines from the United States. Under such circumstances, some publishers in the United States found it necessary, in order to sell magazines in foreign markets, to grant licenses under contracts to foreign publishers to print their magazines abroad, and some of the larger publishers opened offices in cities overseas. Shortages of paper in some countries limited the printing of magazines abroad. It must be assumed that petitioner knew *252 about these restrictions before taking the trip; there is nothing to the contrary in the record. Prior to 1950, Kable News resumed some business dealings with Atlas in London but the record does not show the volume of such business or of any other overseas business of Kable News at any time up to and including 1950. Campbell went by airplane to London in 1947. Kable News carried on a small amount of correspondence with Dexter at Atlas, and there is in the record one letter from Gordon and Gotch. The evidence is meager about the foreign business of Kable News before, during, and after 1950. With respect to the restrictions of the British Government on the importation of magazines into England in 1950, and after, the record is not clear. For example: In a letter to Campbell dated June 19, 1950, Dexter, the manager of Atlas in London, expressed interest in a magazine distributed by Kable News (published in the United States) and said: "But how they can be imported, having regard to the present import restrictions, I do not know." In September 1950, Campbell wrote Dexter, "* * * When am I going to hear from you about doing a little business with your good Company?" In another letter to *253 Campbell dated October 23, 1951, Dexter inquired about certain magazines published in the United States, as follows: "As you know, none can be imported. Am I to understand that they are all available for reproduction over here?" In another letter at about the same time Dexter inquired of Campbell about the possibility of Atlas's obtaining reproduction rights in England of a United States magazine. In his testimony, Campbell stated that in London he called to see Dexter at Atlas, Gordon and Gotch, the banking house of Brown, Shipley and Company, the British Dollar Exports Board, the London office of the United States Chamber of Commerce, and 2 London publishers. He testified that Kable News was sending some magazines to England in 1950, but he failed to indicate the extent of such exports. The inference to be drawn from all of the record is that because of British restrictions, Kable News was unable to do much business in England in 1949 and 1950 and that the restrictions were fixed and inflexible. Campbell testified that he spent 7 days there in July before going to Ireland. With respect to the purpose of Campbell's visits in various cities on the Continent, the petitioner's proof *254 consisted of his extremely limited testimony which was merely to the effect that he called on some wholesalers of magazines whose names he had obtained from a publisher in the United States. The petitioner gave the names of 8 wholesale distributors of magazines and one publisher on whom he called; 2 in Amsterdam, 1 in Brussels, 4 in Switzerland, and 2 in Paris. The record shows that in Holland there were certain restrictions relating to the free dollar allocations for the importation of periodicals and books into Holland, and there were shortages of paper in France which limited the reproduction there of magazines produced originally in other countries. Campbell's proof amounted to no more than listing the names of concerns where he allegedly called. There is, on the whole, nothing in the record to enlighten us about the nature of any business prospects or projects which were discussed with any of the named concerns in cities on the Continent, and nothing at all about the expenses incurred in order to stop in the various cities. The petitioner failed to show that Kable News in 1950 was doing any business at all on the Continent, or that there were any real possibilities of doing any *255 in the future, or that any specific items of business were discussed. He was unable to show that any new business was obtained in England or on the Continent for Kable News. With respect to petitioner's visits in Switzerland, where he stopped in Basle (Bale), Berne, Lucerne, and Geneva, there is nothing in the record which establishes that any of the 4 magazine distributors contacted in Basle, Berne, and Geneva carried on operations which would enable Kable News to do any business at all with any of them. The nature and extent of the businesses of the Swiss concerns are not shown. With respect to petitioner's visit to Ireland, he testified that there were no wholesale distributors of magazines there with whom Kable News could do any business. Petitioner failed to prove that he did any real or necessary business for Kable News while he was in Ireland. We find that no necessary and bona fide business purpose directly related to the corporation's business was carried on in Ireland; that the corporation's business did not require visiting Ireland; and that petitioner's trip there was wholly for personal reasons. The petitioner visited Holland, Belgium, Switzerland, France, England, and *256 Ireland; altogether, 6 countries. He seeks to avoid the inclusion in his taxable income of a large sum, over $8,000, which was paid by his employer, a corporation over whose operations he exercised control. The treasurer of the corporation was not a stockholder. He testified that he never questioned Campbell's requests for funds for travel and entertainment expenses because Campbell was the president and exercised the final judgment about such matters. The treasurer made no inquiry about the nature of the total cost of the European trip. He did not obtain any itemization of what was paid by the corporation and knew nothing about any details. It was therefore within Campbell's discretion to determine both the extent of the trip abroad and the costs involved, which he charged to the corporation's account for travel expenses of executives. The corporation accepted disallowance of its deduction for the entire expense. In this case, petitioner's burden was to show what necessary and bona fide business purposes directly related to the corporation's business, if any, were involved and required his visit to each country. His burden of proof could not be satisfactorily discharged by merely *257 reading into the record the names of foreign business concerns in various cities. Only with respect to Gordon and Gotch and Atlas in London, and a general interest in doing some business in Holland, is there any corroboration of the petitioner's testimony about the business purpose of his entire trip abroad. It is obvious that to accept merely a list of names of foreign business firms, without corroborating details, as proof of a necessary and bona fide business purpose of the foreign travel of an executive who does not keep records of expenses and exercises control over a corporation would lay open to abuse claims that expenses of foreign travel are ordinary and necessary business expenses. Furthermore, expenditures by a corporation for the use of its president, who is the controlling and dominant stockholder, are always subject to close scrutiny in order that what is actually a distribution of profits may not be disguised as payment of business expenses. Cf. Miles-Conley Co. v. Commissioner, 173 F. 2d 958, 960; Heil Beauty Supplies v. Commissioner, 199 F. 2d 193; Nowland v. Commissioner, 244 F. 2d 450; Paramount-Richards Th. v. Commissioner, supra. In addition, where there *258 are opportunities for a personal vacation and recreation during travel it is incumbent upon a taxpayer to show clearly that the primary purpose of the particular travel was not for recreation and that making a few side calls on business firms was not merely incidental. Thus, competent proof of the time devoted to business matters and the substance of them may be persuasive that a business purpose was primary and recreation was only incidental. In this case, the absence of information about the nature of petitioner's purported business calls in Switzerland and the time devoted to them leaves us in doubt about whether the whole trip in Switzerland, where petitioner apparently spent 6 days between his visits in Brussels and Paris, had a necessary and bona fide purpose related to the corporation's business. The absence of proof about the actual matters discussed during most of the calls which petitioner claims he made to see wholesale magazine distributors in certain cities of the Continent and of the time devoted to them is material in considering whether the petitioner has met his burden of proof. His bare assertion that "the primary purpose" of the whole trip was "to explore the possibilities *259 for arranging for distribution of general type magazines abroad" is too sweeping and tenuous to satisfy the burden of proof involved here, particularly in view of the number of countries visited and the duration of the whole trip. The respondent argues that the credibility of petitioner's testimony must be seriously questioned; that he has been inconsistent in his explanations; and that at best the record shows that the purpose of the trip of the Campbells was to combine pleasure with business. The respondent introduced a memorandum filed with the Commissioner before the statutory deficiency notice was issued. It was prepared and signed by petitioner's accountant who stated therein that he had relied upon information given to him by the petitioners. The memorandum was sworn to and signed before a notary public by both Campbell and his wife. They affirmed that they had read the memorandum and "that the statements contained therein are true." In this memorandum the following, inter alia, was stated: In the year 1950 Mr. and Mrs. S. J. Campbell went abroad for the purpose of investigating the possibility of extending the distribution of magazines of the Kable News Company to European *260 cities and also for the purpose of inspecting the high grade thoroughbred horses in England and Ireland. While over there S. J. Campbell visited a wholesale news dealer in Brussels, a wholesale news dealer in London, and a wholesale news dealer in France. He also visited the horse show in Dublin and also one in England, and in the subsequent year 1951 S. J. Campbell was appointed one of the judges of the International Horse Show in London. Petitioner's only explanation at the trial of the inconsistencies between the above statement and his testimony was that he relied upon and had confidence in his accountant. Such explanation is less than wholly credible. Petitioner has failed to present competent proof that his entire trip was devoted primarily and substantially, in each place visited, to the business interests of Kable News. His proof is generally so equivocal and tenuous that the only conclusion which can be made is that his trip was only in part for bona fide business purposes. The least doubt exists about his visits in England, Holland, Belgium, and France where, according to his testimony he devoted about 11 days, altogether, during July. It has been concluded that the visit *261 in Ireland, in August, was for personal reasons. There is no competent proof that the petitioner attended to any business matters in August, before leaving, when he returned to London. Exclusive of the time required for the return trip by ship, petitioner was not occupied with the corporation's business during 4 weeks in August. On brief, the respondent states that it is his position that any approximation by the Court of an amount for the expense of the business portion of petitioner's trip should be heavily weighed against him because of his complete failure to establish any amount as the expense of that portion of the trip. The respondent refers to the rule of Cohan v. Commissioner, 39 F. 2d 540, 543, modifying 11 B.T.A. 743, 761. We know only that the corporation spent over $8,000 for the trip and cash paid to the petitioner. We do not know how, or for what purposes, the whole amount which the corporation advanced was spent, or whether all of the cash was spent, in fact. The respondent did not allow the corporation any deduction for any part of its total outlay, and he determined that the corporation paid petitioner's personal expenses to the extent of all which it advanced *262 for and to him. At the trial, the petitioner did not make any effort to prove (or even to estimate) how he spent $8,291.16; or to prove (or estimate) the costs of the obvious categories of the expenses of such trip, .e., the cost of the accommodations each way aboard ship, the costs of traveling on the Continent to England, and to Ireland, the costs of accommodations in various hotels, and of meals, entertainment, and incidentals. Even though petitioner did not keep any records, such expenses in general were certainly matters within his own personal knowledge and it is incredible that he did not have sufficient recollection of the costs and expenditures to establish in some way a breakdown of the total amount in issue into types of expenditures. Instead, he obviously has relied on this Court, under the Cohan rule, to do for him what he was required to do, and we think was able to do, for himself under his burden of proof, namely, to break down the total sum into its component parts and estimate all of the types of expenses. Under all of the circumstances, in view of petitioner's failures under his burden of proof, we are reluctant to engage in making any estimate under the Cohan rule *263 of a reasonable allowance for the ordinary and necessary expenses of the business portion of petitioner's trip, without any division by the petitioner of the total sum. From such breakdown of the whole sum, we might be able to intelligently determine a reasonable amount for the business expenses involved. As the record stands, it must be candidly stated that we are obliged under the Cohan rule to make "personal estimates" which "will inevitably be speculative", as the Court of Appeals recognized would be the result when it so directed in the Cohan case, supra, (p. 544). It also recognized that the amount arrived at by judicial guess might be "trivial and unsatisfactory" to the taxpayer involved. We therefore have made an estimate of an amount which we believe represents a reasonable and fair allocation of the total sum to the necessary and bona fide business part of Campbell's trip abroad. In so doing, we have regarded a business trip as one for which only a reasonable amount of time for both direct travel and expeditious attention to necessary business engagements should be taken into account, rather than leisurely travel. The petitioner testified that on an earlier occasion he flew *264 to London. Therefore, we have regarded travel by plane as the direct and least expensive mode of travel, first class, with respect to both time and costs. Taking into account petitioner's testimony about the number of days devoted to business calls, the most direct travel, and the most expeditious attention to business and business entertainment, we find and conclude that a reasonable amount for the business portion of the petitioner's trip was not more than $2,491.16, which we regard as liberal. It follows that the payment of this amount by the corporation was not payment of personal expenses of the petitioner. It is concluded, further, that $5,800 was spent by the corporation for personal and family expenses of the petitioner. That amount represented taxable income to the petitioner and to this extent the respondent's determination is sustained. Unexplained Railroad Expense, 1950: The corporation did not have any record to show who made use of railroad accommodations in a drawing room from New York to Chicago, including 2 tickets, purchased through the Ritz Carlton Hotel on August 13, 1950. Martin, the treasurer, made a guess that it might have been two Chicago publishers, clients *265 of the corporation, who had been in New York, but he was not positive. The evidence shows that it was customary to obtain from all except Campbell a record or explanation of expenses to be paid or reimbursed by the corporation. We are not convinced that the corporation's accounting practices were so lax that it would have paid the traveling expenses of two clients without making a record thereof. The cost, $142.54, was not trivial. On the other hand, since the petitioner had no record of the various items for which payments were made to American Express in Chicago for the trip abroad, his contention is not convincing that similar tickets had been purchased before June 30 through American Express and that he and his wife did not use the railroad accommodations for their return trip to Chicago following their arrival in New York from abroad on September 2. It is quite possible that the expense was for petitioners' use in view of the relationship of the date of purchase to the date of their arrival in New York. Petitioner has failed to prove that this item of expense was not incurred for his use and was not actually made use of by himself and his wife. However, since the travel involved *266 was in part for the corporation the expense was not wholly personal. We therefore find that $71.27 was a business expense of Kable News and is not includible in petitioner's income. The balance, $71.27, was personal expense of the petitioner and is taxable to him. Travel Expenses of Ileen Campbell: Petitioner's wife accompanied him on 4 occasions when he went to New York City on business in 1949 and 1950. It is incumbent upon him to show that her travel and hotel expenses were primarily business rather than personal expenses. He must establish that his wife rendered services which were closely and directly related to the conduct of the business of Kable News, so that her expenses were necessary and appropriate to that business, and so that business benefits were derived therefrom. Alex Silverman, supra; Louis Boehm, supra.See European Trip, 1950, supra. Ileen is not an officer or employee of Kable News. She did not testify. The petitioner testified that during three of these trips his wife assisted him in entertaining at dinners publishers and others with whom the corporation did business, and their wives; and that in one instance she introduced him to a woman director of a radio *267 program through whom the petitioner thought some publicity for magazines could be obtained. No testimony was given about Ileen's activities during the trip taken in April 1950. The then manager of the New York office testified that it was customary to entertain executives of business concerns and their wives; that Ileen was well acquainted with the wives of the chief clients of Kable News in New York; and that at conventions and meetings of wholesalers and of sales representatives of Kable News, the men brought their wives, and Ileen usually accompanied the petitioner. In general she ordinarily participated with the petitioner in the social gatherings and events which were of interest to the corporation and she was well acquainted with a wide circle of her husband's business associates and their wives. The record shows only that during three of the visits in question to New York City, the petitioner with his wife expressed their friendliness and hospitality by entertaining business friends and their wives at dinners. Although it was undoubtedly part of petitioner's services to Kable News as its chief executive to maintain cordial relations with many publishers, wholesalers, attorneys, *268 and the executives of business organizations whose goodwill and patronage was of importance and benefit to Kable News, and while it is unquestionably true that it was "good business" for petitioner to entertain such persons and their wives, nevertheless those occasions when Ileen was present were social gatherings and her assistance was that of a helpful and gracious wife. Such social entertainment is to be distinguished from business entertainment which is directly a part of the discussion or negotiation of specific business matters. See James Schulz, 16 T.C. 401, 405-406. The petitioner has not shown that during the particular visits of his wife in New York, she performed any actual business services to Kable News either individually in any business matter, or by joining with him in the hospitalities he provided others. He has not shown that the entertainments in which Ileen participated were other than social, or that they had real business purposes closely related to the operations of the business of the corporation, or that the corporation received or expected to receive any specific benefits from her participation. In Louis Boehm, supra, we noted that only in cases where expenditures *269 of a social nature have been shown to have a direct relation to the conduct of a business or to expected business benefits, have such expenditures been held to be business expenses as distinguished from personal expenses. In order to come within the requirements of section 23(a)(1)(A), expenses must be both "ordinary and necessary" in the conduct of a business. Where, as here, the respondent has determined that expenditures are personal, the antithesis of business expenses, the taxpayer must present substantial proof that they are not personal expenses and that they are ordinary and necessary to the business involved within the meaning of section 23(a)(1)(A). Petitioner's proof is vague, at best. Any possible benefit to Kable News from Ileen's presence on these trips was too remote to provide the basis for treating her hotel and travel expenses as its ordinary and necessary business expenses. The respondent allocated one-half of the travel and hotel expenses of these business trips of the petitioner to business expenses of the corporation and allowed it deductions of $682.17 for 1949, and $227.77 for 1950. He determined that one-half of the expenses of the trips were for Ileen's expenses, *270 plus one item of Ileen's railroad expense; and that such expenses were personal, namely, $780.09 for 1949, and $227.76 for 1950. The petitioner has not raised any question with respect to the reasonableness of such 50-50 allocation. The petitioner has failed to establish that $780.09 and $227.76 were ordinary and necessary expenses of the corporation. We find and conclude that the expenses were personal and that the petitioner realized taxable income in the above amounts in 1949 and 1950, respectively. Entertainment Expenses: We come now to several items of expenditures by Kable News in 1949 and 1950 for tickets to a prize fight, horse shows, and charges of the Saddle and Sirloin Club, which totaled $1,674.33 in 1949 and $270 in 1950, for which the Commissioner did not allow any business expense deductions to the corporation. He determined that these items represented personal expenses of the petitioner and included the amounts involved in petitioner's taxable income. The petitioner contends that all of these items, which are listed in the Findings of Fact, involved business entertaining which was an ordinary, necessary, and usual part of the operation of the corporation's business *271 and that, therefore, the respondent erred in including the entire amount expended in his income. At the trial, he conceded that he could have invited a few personal friends to the International Livestock Exhibition held in Chicago. The respondent's position is that the petitioner had a personal interest in livestock and horses; that tickets to shows of that type were purchased because of petitioner's interests and were not for bona fide business entertainment; and that petitioner failed to prove that the expenditures were not for his personal interests. The question primarily is whether the entertainments involved in these expenditures were of direct benefit to the corporation, rather than social or personal. In Louis Boehm, supra, p. 1109-1110, we pointed out that in considering whether a taxpayer has succeeded in proving that expenses are primarily business rather than personal expenses, his burden of proof is not met merely by the assertion that certain kinds of social activities are helpful in obtaining (and we may add, keeping) business clients, and that it must be established that entertainment and similar expenses are "so closely related to the conduct of" a business "as to *272 have been appropriate, helpful, usual, or necessary". We also noted that it appears to be well established that deductions for expenditures, as business expenses, are allowable only if there is proof "that such expenditures had a direct relation to the conduct of a business or the business benefits expected". In James Schulz, supra, we referred to the principle stated in the Boehm case in considering a claim for deductions of expenses of entertaining businessmen and their wives at dinners, theatres, night clubs, and in similar ways, and said (p. 405): Entertainment expenses are allowed as a deduction from gross income only to the extent that they are "ordinary and necessary" in carrying on a trade or business. Section 23(a)(1) of the Internal Revenue Code. The requirements that the expense must be both ordinary and necessary must be strictly complied with, Helvering v. Welch, 290 U.S. 111, and whether contested expenditures are ordinary and necessary is primarily a question of fact. Commissioner v. Heininger, 320 U.S. 467. Proof is required that the purpose of the expenditure was primarily business rather than social or personal, and that the business in which taxpayer is engaged *273 benefited or was intended to be benefited thereby. Louis Boehm, 35 B.T.A. 1106. We concluded that part of the expenses was not deductible business expense because there was little to distinguish certain occasions when businessmen and their wives were entertained "from the usual social gatherings among friends to renew acquaintanceship and enjoy a pleasant evening". We said further: They bear little semblance to the usual gatherings of business people at restaurants or other places of entertainment which serve primarily as congenial places for the discussion or negotiation of business matters. * * * These gatherings may have been desirable and helpful to the present and future success of petitioner's business, but that is usually true of all entertaining done by business or professional people for the purpose of acquiring or retaining the favor of patrons and clients. Such expenditures are nevertheless nondeductible absent a showing that they were ordinary and necessary to the taxpayer's business within the meaning of section 23 of the Internal Revenue Code. The petitioner failed to keep any records of the persons invited to the International Livestock Exhibition, the National Horse *274 Show, and the Saddle and Sirloin Club. For these shows in 1949, during 16 evenings, at least 96 tickets were purchased for box seats. Petitioner was unable to present evidence about all of the guests or what business purpose of benefit to Kable News, if any, resulted from entertaining people at these shows. In view of petitioner's admitted personal interest in livestock and horse shows and his lack of records and adequate proof, the situation here is one in which the petitioner easily could have charged to Kable News the substantial cost of some of his social and personal entertaining. Under all of the circumstances and because of lack of satisfactory proof, we are unable to accept petitioner's estimate that not more than 25 percent of these expenses were personal. On the other hand, we are satisfied from the record that part of the expenses properly can be found to have been for business entertaining directly related to the corporation's business. The tickets to the Walcott fight in 1949 were given to persons actively connected with the business and none of that expense, $591.50, was personal and is not includible in petitioner's income for 1949. With respect to the remainder of the *275 entertainment expenses in 1949, and the one item for 1950, it is concluded that roughly one-half was for strictly business entertainment of clients and others with whom Kable News did business and may be characterized as business expense of Kable News. It is concluded that $541 in 1949, and $135 in 1950 was not payment of personal expenses of petitioner and is not includible in his income for each year. We find, however, that personal expenses of petitioner for personal entertainment were paid by the corporation in the amounts of $541.83 in 1949, and $135 in 1950. In so finding and concluding, we have made approximations because of petitioner's failure to submit adequate proof. Ritz Carlton Hotel Expense, 1949: The petitioner and his wife stayed at the Ritz Carlton Hotel for 11 days at the time of the National Horse Show. The corporation paid their hotel bill of $775.64. The respondent included the entire amount in petitioner's income for 1949. The petitioner contends that he went to New York at this time on a business trip and that attending the horse show was not the primary purpose of the trip, but was only incidental. He also contends that he did some business entertaining at dinners *276 at the Ritz which was included in this bill. Petitioner has failed to prove that the presence of his wife was necessary to any bona fide business interest of Kable News at any time during the trip. The part of the expense allocable to his wife's presence was his personal expense. There is not sufficient evidence to establish with any reasonable certainty the amount and cost of any bona fide business entertaining charged to Kable News in this bill. Although the corporation paid this very substantial hotel bill, it did not require or obtain any expense accounting from petitioner, and at the trial the corporation's treasurer did not present the bill. Petitioner did not present any proof about the specific charges; he kept no records of them. We accept as credible petitioner's testimony that during this trip to New York he was engaged in carrying on business of the corporation which included a conference with representatives of the Chase National Bank and an attorney about negotiations for the purchase by Kable News of 6,400 shares of stock of the corporation held in the respective estates of Warren Angel, deceased, and his deceased wife, which the Chase National Bank represented. A few *277 months later, on January 9, 1950, Kable News purchased that block of stock. Also, during this visit, petitioner had business meetings with several publishers who were clients of the corporation. We are convinced that some part of the hotel charges, those for petitioner's lodging and meals, should be held to have been necessary expenses of a business trip undertaken pursuant to petitioner's duties as president, and that some amount of bona fide business entertaining within the principle above stated, James Schulz, supra, was included in the bill. In the absence of proof of the specific amounts of business expense, an approximation thereof is made. We conclude and find that not more than one-third of $775.64 was business expense and not personal expense; $258.55, therefore, is not includible in petitioner's income. It is held, for failure of proof, that the corporation paid personal expenses in the amount of at least $517.09, which amount is includible in petitioner's income. We turn now to the last category of disputed expenditures by Kable News in 1949 and 1950. Cash Allowances Paid to Petitioner: In 1949, the cash payments to petitioner amounted to $3,562.84, and in 1950 they were *278 $1,976.69. In the absence of records to explain the use of these amounts of cash, the respondent, applying the so-called Cohan rule, made approximations of what amount in each year reasonably might represent ordinary and necessary business expenses of Kable News. He determined that not more than one-third constituted business expense, $1,187.61 for 1949, and $658.89 for 1950; and that the balances constituted income of petitioner, $2,375.23 in 1949, and $1,317.80 in 1950. It has been held that of the disputed amount for 1949, $591.50 (for the Walcott fight tickets) was business expense; not income. We are concerned now with the balance, $1,783.73. The petitioner contends that all of the amounts of such cash allowances were expended by him for cash expenses required in carrying out his duties as president; that such expenses were incurred and paid when he was not traveling and was in Chicago and Mount Morris for the expense of trips between Mount Morris and Chicago and for business entertaining in Chicago; and that such expenses were incurred and paid while he was on business trips for the corporation for meals, tips, taxis, and business entertaining at lunches, dinners, and shows, *279 apart from hotel and transportation expenses which were paid separately by the corporation. Originally, petitioner took the position that none of the cash was used for his personal expenses. At the trial, he expressed doubt about some items and his counsel conceded that a few hundred dollars should be included in petitioner's income. Kable News paid traveling expenses for business trips of petitioner in 1949 and 1950, including expenses of transportation and hotels, which are not involved in this case under any item and for which it was allowed deductions in some unknown amounts by the Commissioner. At the trial, neither party could state what those expenses were. In its returns, the corporation took deductions for administrative travel and other expenses of $44,481.64 for 1949 and $40,866.83 for 1950. The clear inference is that included in these amounts are the traveling expenses of petitioner which were not questioned by the respondent. The cash allowances here involved were in addition. The corporation did not require any accounting from petitioner about his use of the cash or the nature of any of his expenditures, and the petitioner kept no records. No bills, statements, or memoranda *280 were introduced to corroborate petitioner's testimony. He relies entirely upon his testimony. There is no instance throughout of any mention of the dollar and cents amount of any expense or expenditure, and petitioner did not make any estimates of any classes of expenses, such as tips, taxis, meals, and entertainment. From the corporation's records, Martin, the corporation's treasurer, testified about the individual advances of cash, by amount and the dates of payment. Refreshing his memory by referring to his engagements diary, petitioner testified about where he was and whom he saw at and between the dates of each corporation check for a single payment of cash to him. Thus, for example, the record shows that he received $100 on March 25, 1949, and at that time he was in Chicago and was not preparing to go on a trip. He then, at the trial, gave no specific explanation or accounting of his use of the money other than to refer to a notation in his diary that a New York publisher with whom Kable News did business visited Chicago at that time. On another occasion, petitioner received some cash prior to taking a trip to New York. He testified that he saw several people and read their names *281 from his diary. Petitioner's procedure was to attempt to correlate his diary notes about his engagements with the amounts of cash he received on various dates. There were no notations in his diary of any item or amount of expense or expenditure. Petitioner's proof consists of a recitation of his engagements, trips, and the names of people, interspersed with statements that he used a cash withdrawal for general expenses, or that he took someone to lunch, dinner, or a show. As in Lucian I. Yeomans, supra, p. 875, petitioner testified that he kept track of his use of the cash allowances by keeping the corporation's funds in a separate purse apart from his personal funds, that he spent the corporation cash only for business uses, and that when an allowance was exhausted he renewed the supply of corporation cash. Before the issuance of the deficiency notice, petitioner submitted a sworn memorandum-protest to the respondent (referred to hereinbefore) to which was attached a typed reproduction of petitioner's engagement diary notes. Respondent introduced this in evidence. Petitioner's testimony is a repetition of such material, and little else. It is evident that the Commissioner had substantially *282 the same information when he made his determinations as has been presented here, and that the petitioner introduced into the record very little more than was presented to the Commissioner. The cash allowances in question were not just expense allowances determined by Kable News; they were withdrawals by the petitioner which he made within his own discretion, when and in such amounts as he desired. The treasurer of the corporation did not question the requests for funds and always paid them. Usually, petitioner withdrew cash through checks of the corporation made payable to his secretary; on the corporation's books all such withdrawals were entered as "traveling expenses"; and the corporation did not require any accounting from petitioner. Petitioner could freely withdraw cash from the corporation and he could freely spend it. Where a corporation, particularly a closely held corporation, does not require any accounting for the use and expenditure of company cash by an officer-stockholder, there is great opportunity for the use of such money for personal purposes by the officer-employee, and for a corporation's payment of personal expenses in the guise of making advances or reimbursements *283 for purported travel and entertainment expenses of a business nature. The opportunity for gross abuse of the business practice of employers of paying the bona fide business travel and entertainment expenses of an employee under such circumstances is great. Cf. Ralph E. Larrabee, 33 T.C. 838, 842; Eugene H. Walet, Jr., 31 T.C. 461, 471. In this case, we have great looseness in the corporation's practice of paying cash to its president and chief stockholder without requiring the submission of expense accounts or any kind of accounting, and this looseness is compounded by the taxpayer's disregard of the statutory obligation imposed on him to keep and maintain records by section 54(a) of the Code, which requires that Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe. The respondent has determined that the amounts in dispute represented payments by Kable News for petitioner's personal benefit and, therefore, constituted income to him. His determination *284 carries the presumption of correctness which may be overcome only by clear and detailed evidence as to each instance of expense and expenditure, and about the amount of the expenditure, the nature and the purpose, and the extent of the relation thereof to the conduct of the corporation's business; i.e., the "who", "when", "where", "why", and "how much". Cf. Richard A. Sutter, 21 T.C. 170, 173. Petitioner contends that a great deal of entertaining of business people is necessary and ordinary in the operations of Kable News' business. Such argument is not unusual, and in the Walet case, supra, we had occasion to say that "certainly, the word 'entertainment' is not a magic formula entitling one to deduction without inquiry as to whether the entertainment in question really had a significant bearing upon the conduct of the * * business". We make the same observation here. The petitioner relies upon the Cohan case. The respondent already has made approximations under the Cohan rule. The petitioner wants this Court either to reverse the whole determination for each year, or apply the Cohan rule treatment a second time, even though he has presented very little, if any, more facts to us *285 than were presented to the Commissioner. The so-called Cohan rule may be applied if the taxpayer produces satisfactory proof that he has incurred and paid some amount of money for expenses which under section 23(a)(1)(A) are ordinary and necessary expenses of a business and are business travel, lodging, and meals expense; and the trier so finds, in spite of the absence of records to substantiate the taxpayer's claim; but otherwise the Cohan rule will not be applied. Where an amount of money advanced or reimbursed to a taxpayer is in dispute and there are no expense or accounting records, there is the possibility that the amount of cash involved might have been more than sufficient to cover the taxpayer's disbursements for entertainment and other business expenses. In that respect, the situation here, and in general, differs from Cohan v. Commissioner, supra.See Moses Mitnick, supra. Courts have concluded in several instances that the evidence was not sufficient to provide a basis for applying the Cohan rule. See Chesbro v. Commissioner, 225 F. 2d 674, affirming 21 T.C. 123, certiorari denied 350 U.S. 995; Williams v. United States, 245 F. 2d 559, 560, affirming an unreported *286 District Court decision, W. Horace Williams Company v. Lambert, U.S.D.C.E.D. of La., July 10, 1956; R. J. Reynolds Tobacco Company v. United States, 149 F. Supp. 889; Eugene H. Walet, Jr., supra. In Neils Schultz, 44 B.T.A. 146, 151, we distinguished the Cohan case and declined to apply to so-called Cohan rule; we said 4. The petitioner on his returns deducted $11,011.81 for 1935, $18,595.62 for 1936, and $17,035.57 for 1937, as "rent, repairs and other expenses," $1,571.20, $1,947.05, and $1,379.65, respectively, were called "general expenses". The Commissioner disallowed $1,178.40, $1,428.47, and $1,034.74 of these amounts because they were "not substantiated." In other words, he allowed about one-fourth of the amounts deducted as general expenses. All that the evidence shows is petitioner's general statement of how the amounts were spent. Presumably the Commissioner had as much information as this when he made the determination and was unable to verify it. It can not be said that petitioner's reiteration on the witness stand gives the claim any greater support. This is not like the situation in Cohan v. Commissioner, 39 Fed. (2d) 540, for the Commissioner has not disallowed *287 the entire deduction. He has recognized that "something was spent", and has made presumably "as close an approximation" as he could. There is nothing upon which the Board can base a different or greater approximation. The determination is sustained. In Williams v. United States, supra, referring to the applicability of the Cohan rule, the court said: The district court may not be compelled to guess or estimate. It may not be compelled to estimate even though such estimate, if made, might have been affirmed. For the basic requirement is that there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purposes. Until the trier has that assurance from the record, relief to the taxpayer is unguided largesse. [Italics added]. The record shows that petitioner doubtless incurred and paid certain cash travel expenses (other than those for transportation, hotels, and meals paid for by the corporation) and some business entertainment expenses in connection with the performance of his duties as president of Kable News. Respondent has made approximations of expenditures for such expenses, the amounts of which *288 were not included in petitioner's income and were allowed as deductions of the corporation. Petitioner failed to introduce proof that he made expenditures for such business expenses in an amount in each year which is larger than the respondent approximated. In those instances where petitioner's proof about the occasions for spending cash advanced to him is persuasive that there were business expenses, we cannot find and conclude that the respondent's approximations do not already cover the likely business expenses, or that petitioner has not already received the benefits such proofs provide. All the record before us shows is petitioner's general statement about the occasions he had for making expenditures and his uncorroborated assertion that he spent all the cash for business purposes. It is clear that the respondent had substantially the same information as has been given to the Court when he made his determinations and could not verify the claimed deductions of Kable News. Petitioner's mere reiteration on the witness stand of such vague and general assertions did not give his claims any greater support. We can not find and conclude from the record that much of the claimed entertainment *289 expenditures could qualify as business expenses of Kable News, rather than social, personal expenses, or that petitioner's expenditures for expenses incurred while on trips were greater than the respondent has allowed. Accordingly, there is no occasion to make an approximation for each year under the Cohan rule, in addition to respondent's approximation. This is not like the situation in the Cohan case where the Commissioner disallowed in toto the taxpayer's claim. Under the Cohan rule, the respondent has recognized that "something was spent" out of the cash allowances for business expenses, and he made, presumably, "as close an approximation" as he could. There is not sufficient proof upon which the Court can base a different or greater approximation for each year. Cf. Neils Schultz, supra.It is concluded, for failure of proof, that from the cash allowances petitioner realized income of $1,783.73 in 1949 and $1,317.80 in 1950. On brief, petitioner makes an alternative contention that if certain amounts are held to be income, then he is entitled to business deductions in the same amounts, as expenses of carrying on his farming and livestock business. The pleadings do not present *290 such issue; it is not before us; no such issue was tried; it cannot be adjudicated. Issue 2. The question is whether the respondent erred in determining that the gain realized from the sales of riding and hackney horses was taxable as ordinary income. The petitioner contends that both classes of horses were "property used in the trade or business" within the definition in section 117(j)(1), and that he is entitled to treat the gains and losses from the sales of the horses as capital gains and losses under section 117(j)(2). The petitioner claims that both types of horses were used in a business, and that neither type was held "primarily for sale to customers in the ordinary course of his trade or business." The pertinent parts of section 117(j) are set forth below. [2] *291 *292 The question as it relates to the sales of riding horses in 1949 is considered first. The petitioner now concedes that he erred in including the gain from the 2 horses held for less than 6 months in his computation of net capital gain from sales of all kinds of livestock in schedule D, and that such gain of $290 is ordinary income. With respect to the 8 horses held for more than 6 months, the respondent now concedes that they were used in the business of petitioner, that they were not held primarily for sale in the course of such business, that they come within section 117(j)(1), and that the loss of $230 may be considered long-term capital loss under section 117(j)(2) provided petitioner realized in 1949 capital gains in excess of capital losses. However, the respondent contends that if his determination with respect to the hackney horses and the gains from such sales is sustained, the petitioner did not have capital gains in 1949 in excess of the loss of $230. In Regulations 111, section 29.117-7, pp. 467-468, the operation of section 117(j)(2) is illustrated and it is made clear that all recognized gains are to be listed, or taken *293 into account; all recognized losses are to be listed, or taken in account; and the total of all gains is to be compared with the total of all losses in order to determine whether the recognized gains exceed the recognized losses. If "the aggregate of the respective recognized gains exceeds the aggregate of such losses, such gains and losses are treated under section 117(j) as gains and losses from the sale or exchange of capital assets held for more than 6 months." See, also, Farmer's Tax Guide, 1960 Ed., Internal Revenue Service Publication No. 225, pp. 40-44. Regardless of whether or not the gains from the sales of hackney horses may receive preferential treatment as capital gains, the petitioner had other capital gains in 1949 in the amount of $4,199.05, after respondent's determination involved here, which were not disallowed. Since such recognized capital gains exceeded the loss of $230, that loss may be treated under section 117(j)(2) as a loss from the sale of a capital asset held for more than 6 months, as the petitioner claims. With respect to this item, the petitioner is sustained. We now take up the problem of the hackney horses, which involves gains of $2,630 in 1949 and *294 $5,575 in 1950. The particular question to be decided is whether or not the hackney horses were held primarily for sale in the course of petitioner's business. Petitioner has the burden of establishing that they were not so held. If he fails in his burden of proof, the respondent's determinations must be sustained because section 117(j)(1) specifically excludes from the treatment prescribed by section 117(j)(2) property held for sale. The purpose for which the hackneys were held is a question of fact. Petitioner introduced very little evidence about the hackney horses. The record shows that all except one of the hackneys involved was originally purchased and only one was foaled. There is no evidence that the hackneys involved were used for draft or breeding purposes. All are described as show horses and no contention is made that any were used for breeding purposes. Petitioner claims that he did not keep the hackneys as a mere hobby for his personal satisfaction. The inference necessarily is that he held them expecting to realize profit. However, the evidence shows that he did not realize any profit from showing the horses and that his profits were realized only through sales. The *295 petitioner argues that the length of time the hackneys involved were held, some for 4 or 5 years, is evidence that they were not held primarily for sale. Lacking more complete evidence about petitioner's general procedures with respect to all of his hackneys, of which there were usually about 25 in the Argyle Stable, and about the record of his sales in each year prior to the taxable years, we believe that the length of time the horses were held is only one element to be considered and that without more evidence, the fact that some of the horses which were sold were held for as long as 4 and 5 years is not sufficient to overcome the prima facie correctness of the respondent's determination. The fact that a hackney had been held for several years apparently did not mean that such horses could not be sold at a profit. For example: Two of the horses sold in 1950 had been held for 5 years and 8 months; they were sold for $2,500, each, at a profit of $2,100 each. The basis of each (inventory value at the time of sale) was $400; the original cost of each was $1,250. A horse which had been held for a little over 1 year, was sold at a profit of $160, its original cost having been $50, and *296 its basis $40. The horse which was sold for the largest price, $3,000, had been held for a little over 2 years; its original cost was $3,100, and its basis was $1,000, so that a profit of $2,000 was realized. Thus, from the limited amount of evidence before us, it seems evident that factors relating to the merits of a hackney were of more importance in determining the selling price and the profit to be obtained upon sale than the length of time the petitioner had held the horse. There is no evidence about the amounts of premiums received for showing each horse. The value of a hackney conceivably may be indicated by its record of winning or obtaining high premiums at shows. There is nothing in the record relating to what entered into and determined the market value of each hackney when it was sold in the taxable years. There is no evidence about the average period of time petitioner ordinarily held hackneys before selling them; or about the average number of sales made each year, apart from the taxable years; or about the frequency of his sales of hackneys. Lacking such evidence, taking an overall view of the entire scope and nature of the business in which the hackneys were used, we *297 are unable to conclude that petitioner's primary purpose in keeping hackneys was merely to show them, or that the sales in the taxable years were casual, isolated, and merely incidental to the business in which hackneys were used. In Albert T. Erickson, 23 T.C. 458, which involved bulls rented for breeding purposes, we took the view that renting the bulls "in order to realize profit while growing and fattening them for market does not establish that the primary purpose in holding them was for rental for breeding purposes." We noted, also, that the bulls were purchased with the intention of selling them, after raising and fattening them, and we found that the taxpayers' "expectation of profit was from the sale of the bulls rather than from rentals for breeding purposes." It was concluded that the bulls were held primarily for sale in the course of the business and that preferential capital gains treatment was not allowable under section 117(j). We observed (p. 462) that section 117(j)(1) "was not meant to apply to a situation where one of the essential or substantial objects in holding property is for sale." The only reasonable conclusion here is that the petitioner was engaged in *298 a business for profit, in which hackney horses were used, that his profits were realized from sales, and that his expectation of profit was from sales of the hackneys rather than from premiums received for showing them at horse shows. Petitioner sustained losses from showing the horses (the expenses exceeded the premiums). On the other hand, he realized substantial profits when he sold them. The petitioner has failed to overcome the prima facie correctness of the respondent's determination. We find and conclude that the hackney horses were held primarily for sale in the ordinary course of petitioner's business. It follows that the gains realized from the sales in the taxable years are taxable as ordinary income, as the respondent determined, and cannot be treated as long-term capital gains under section 117(j)(2). In view of our conclusion, it is not necessary to consider another question, whether the hackneys are property of a character which is subject to the allowance for depreciation provided in section 23(1), and whether despite the fact that the petitioner inventoried the hackneys, he would be entitled under section 117(j), nevertheless, to capital gain treatment of the gains *299 from the sales thereof. See Elsie So Relle, 22 T.C. 459, 473; and Mim. 6660, 1951-2 C.B. 60. It is observed, however, that in So Relle, on which the petitioner relies, the property which was inventoried was a breeding herd, stock culled from that herd was involved in the issue, and the respondent conceded that the taxpayer was "entitled to capital gain treatment on sales of stock culled from that herd if such stock was held by him for more than 6 months." No similar concession has been made by the respondent here, and it is apparent that on its facts and under that particular issue the So Relle case is distinguishable from this case. Decision will be entered under Rule 50. Footnotes
*. Paid for 26 tickets to Chicago Stadium at $22.75 each.↩
*. Tickets to C-W fight.
1. Sec. 22(n) Definition of "Adjusted Gross Income". As used in this chapter the term "adjusted gross income" means the gross income minus - * * *
(2) Expenses of travel and lodging in connection with employment. - The deductions allowed by section 23 which consist of expenses of travel, meals, and lodging while away from home, paid or incurred by the taxpayer in connection with the performance by him of services as an employee. (3) Reimbursed expenses in connection with employment. - The deductions allowed by section 23 (other than expenses of travel, meals, and lodging while away from home) which consist of expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer.
2. SEC. 117. CAPITAL GAINS AND LOSSES. (j) Gains And Losses From Involuntary Conversion And From The Sale Or Exchange Of Certain Property Used In The Trade Or Business. - (1) Definition Of Property Used In The Trade Or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, * * * which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry. (2) General rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *